RIVERS v. LOCKWOOD.

FOX et al. v. IGOE et al.

(District Court, E. D. South Carolina. January 5, 1917.)

1. RELEASE ⬤⇒17(1)—SEAMEN.
    Where, after salvage service has been performed, a full and fair dis-
    closure of the amount of salvage received is made to the crew of the salv-
    ing vessel, the extent of their rights is fully and fairly explained to them,
    and they are given an opportunity to consult with some disinterested
    third person, if they then make an agreement as to their share, and on its
    payment execute a release, they will be bound by the settlement; but,
    when such disclosure is not made, a release executed by a seaman, on
    payment to him of such sum as the owner sees fit, and especially where
    he is ignorant of his rights and of the value of salvage services, will not
    bar his right to maintain a suit to recover his proper share of the amount
    received.
        [Ed. Note.—For other cases, see Release, Cent. Dig. § 32; Dec. Dig.
    ⬤⇒17(1).]

2. SALVAGE ⬤⇒38—APPORTIONMENT BETWEEN VESSEL AND CREW.
    The share of a salvage award to which a common seaman is entitled
    depends on the character of the service rendered, the danger to the crew,
    and the value of their individual services, as compared with those of the
    vessel.
        [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec.
    Dig. ⬤⇒38.]

3. SALVAGE ⬤⇒38—APPORTIONMENT BETWEEN VESSEL AND CREW.
    The crews of tugs, which performed salvage services in several cases,
    held entitled to recover as their collective share, to be divided in propor-
    tion to their wages, from 10 per cent. to 20 per cent. of the salvage re-
    ceived by the tugs, the lower amounts where the service was chiefly one
    of towage, but paid for on a salvage basis, and the higher amounts in
    cases where the service was rendered to vessels on fire.
        [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec.
    Dig. ⬤⇒38.]

In Admiralty. Suits by Alvin Rivers against Ella Ann Lockwood
and by William Fox and others against James J. Igoe and others. De-
crees for libelants.

J. P. K. Bryan, of Charleston, S. C., for libelants.
Alfred Huger, of Charleston, S. C., for respondents.

SMITH, District Judge. These two causes arise upon libels in per-
sonam. The libel in the case of Alvin Rivers v. Ella Ann Lockwood
was filed on the 4th of August, 1916. The libel in the case of William J.
Fox and others against James J. Igoe and others was filed on the 28th
of October, 1916. The defendants in both cases have appeared and
answered, and the causes, being at issue and ready for trial, came on to
be heard. By agreement of counsel the testimony in the two causes
was taken at the same time; the testimony to be considered as taken
in both causes, and both causes were heard and argued at the same
time. Both causes are instituted for purposes of recovering the share
of salvage claimed to be due to libelants, who were part of the crews

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the tugs owned by the respondents, and the owners of which tugs received the salvage charged and paid for the services performed. There is no dispute as to the material facts; there is no dispute as to the amounts of money received by the respondents. With the exception of the case of one vessel, viz., the yacht Onawa II, the respondents admit that they were cases of salvage. In the case of the yacht Onawa II, the respondents deny that it was a case of salvage, and allege it was only a case of towage.

[1] Taking up first the case of Alvin Rivers against Ella Ann Lockwood, the owner of the steam tug Cecilia, the libelant claims his share of the salvage awarded in five cases, viz., the steamship Orion, salved about the 22d of December, 1914; second, the yacht Onawa II, salved about the 3d of January, 1915; third, the barge City of San Antonio, salved about the 3d of April, 1915; fourth, the yacht Neckan, salved about the 26th of June, 1916; fifth, the steamship Colorado and cargo, salved in October, 1915. The answer of the respondents admits salvage service to the steamship Orion, for which the respondents received net $11,693.82. It also admits salvage service to the barge City of San Antonio, for which respondents received net $702.20. It also admits the salvage service to the yacht Neckan, for which was received net $325, and admits, further, the salvage service performed to the steamship Colorado and cargo, for which was received net $18,939.30. The answer denies that any salvage service was performed in the case of the yacht Onawa II, but that simply a towage service was performed, for which the owner of the tug was paid $450. The answer further sets up that in each of the cases of the Orion, the City of San Antonio, and the steamship Colorado and cargo, the libelant had been paid after the salvage services were rendered the sum of $20 in each case, which sum he agreed to accept and did accept in full for his services as his proportion of salvage money. In the case of the yacht Neckan the respondent alleges that she is ready, and always has been, to pay the amount due the libelant, as a member of the crew, but the libelant has never given an opportunity to the salvors to pay the same, but, on the contrary, instituted these proceedings to recover his share of salvage even before the amount of salvage in that case was paid. From the testimony it appears that the libelant Alvin Rivers was a deckhand on the steam tug Cecilia at the time of the alleged salvage in all the above-mentioned cases. The testimony also shows that subsequent to the performance of the salvage service in each of the cases of the Orion, the City of San Antonio, and the steamship Colorado and cargo, the libelant did accept $20, and executed a written receipt for the $20 as being in full payment of his portion of salvage as rendered in the case. The first question in the case is as to the effect of these receipts, or any agreement embodied in them, operating as accord and satisfaction, so as to be a bar to any proceedings to recover more in this case.

The question as to the effect of an agreement as to the amount of salvage to be paid was considered by this court in the case of Conekin v. Lockwood, 231 Fed. 541. There this court discussed the question of the claim for salvage on the part of one of the crew of the tug Ce-

cilia for the salvage of the steamship Colorado and cargo, one of the very cases in which salvage is claimed in the present proceedings. In that case this court held that an agreement made in advance by a seaman with the master or owner of a vessel that he will accept one month's pay as his share in all cases of salvage would be wholly inoperative. The difference between that case and the present is that in that case the alleged agreement had been made in advance of any salvage service performed, while in the present case there has been produced and proven a written receipt embodying an agreement made subesquent to the performance of the service. It would not appear reasonable that there should be no way of adjusting the proportion of salvage to be paid to the crew except by coming into court. To hold that the effect of the decisions, and of section 4535 of the United States Revised Statutes (Comp. St. 1913, § 8324), was to prevent any seaman by any agreement or instrument, unless approved by the court, fixing the amount of the share of salvage to be paid him, would mean that no settlement of the kind could be had with the crew except upon application to the court. This would be unreasonable, as requiring unnecessary litigation, and further as holding that people, such as seamen, who are sui juris, and compos in all respects, should not be able to contract about a question of what proportion they are entitled to in a claim for salvage service performed. At the same time it is to be borne in mind that salvage is paid much as a matter of public policy, to stimulate effort; that the result of the public policy in this respect would be frustrated if a man were allowed carelessly or heedlessly or ignorantly to release his rights, so as he would not be stimulated by actually receiving, and those in his class would not be stimulated by knowing of the actual receipt by him of the full reward given by law for such service.

Sailors of the class of most of these libelants are a very ignorant and helpless class. They are wage-earners who in most cases are very much afraid of losing their job and wages, and are fit for no other employment, and likely under the dominion and compulsion of the officers under whose orders and in subjection to whose commands they habitually serve, and therefore likely to yield to their wishes in this respect. They have been termed the wards of the court of admiralty, and the meaning of this is that they are recognized as being so helpless and incapable from their generally ignorant and impoverished condition, and the floating character of the life, which leaves them seldom long in one place, and so unable to protect themselves, as the court of admiralty takes somewhat the same charge of them as the court of chancery does of infants, or as it did of married women. Where, after salvage service has been performed, a full and fair disclosure of the amount of salvage received is made to the members of the crew, and the extent of their rights is fully and fairly explained to them, and they are given an opportunity of hearing this and discussing it with some third party, such as a United States commissioner or any lawyer representing them, or any unbiased third party, not in the employ of, or connected with, or under the influence of, the owners of the tug—where, after this, the members of the crew enter into a final

agreement accepting a stipulated sum for their share of the salvage, and receive that sum and execute a release, in the opinion of the court that ought to be given full consideration as normally effecting a final settlement of their claim. To hold otherwise would be to hold that the owners of the salving vessel, who receive the salvage compensation, would never be able to settle finally, however fair their intentions, without appealing to a court of competent jurisdiction to approve the settlement.

Under the circumstances of the present case, however, the court does not find that there was such a showing made and given to this libelant, Alvin Rivers, who is a colored man, but a seaman, and, like most colored seamen, ignorant, both of his rights and of the value of salvage services, as to operate as a bar in this case; and it is therefore ordered, adjudged, and decreed that the receipts set up and proven in this case, and the agreement thereby evidenced, are no bar to the recovery by the libelant Alvin Rivers of his proper share in the matters to which he may be entitled to salvage as alleged in the libel.

[2] Before taking up the specific salvage cases alleged in the libel, it should be further stated that in considering them the court is necessarily bound to consider what it is that operates most efficiently to effect the salvage success. This matter was alluded to in the case of Conekin v. Lockwood, above referred to. The individual effort of a common seaman in some cases of salvage may count for practically nothing. Take the case of a vessel in distress from the loss of her motive power, but at anchor in the open sea, and therefore more or less at risk. To take her in tow in fair weather and bring her into port is nothing but what a competent tug can do easily at any time, and in so doing no member on board of the tug is called upon to make any effort or run any risk that he would do otherwise than in the ordinary current course of his employment. Such cases, although perhaps salvage services, are termed salvage of a low order. It differs entirely, of course, where a vessel in distress may be stranded, and the weather may be stormy, and the salving vessel, the tug, risks both the safety of the tug and in so doing the safety of the crew, by performing the salvage service. So, also, may the salvage service of the crew be much greater in the case of fire on a boat, where the crew are called upon to go and perform service on or for the burning vessel, for the purpose of extinguishing the fire; there the individual efforts of the crew, in its relation to the efforts of the tug, are very much increased, although even in those cases the capacity of the tug to pump the water which will extinguish the fire is one of the main elements in effecting the success of the salvage. The rule of public policy before referred to is to stimulate vessel owners as well as seamen. It is most essential that for swift and efficient salvage there should be tugs dispersed in the different harbors along the coast of sufficient capacity and with the proper equipment to effect salvage rescues. The maintenance of such tugs is a matter of great expense. Unless the owners of such tugs are encouraged to keep them in condition and have them ready to risk on salvage ventures, all the willingness and effort of individual seamen would be unavailing. A crew may be procured at any port. A proper

seagoing tug is not to be found so readily, nor unless the stimulus for having them be sufficient.

[3] In the salvage cases, the first case alleged in the libel is that of the Orion. That was the case of a steamship loaded with cotton on fire in the harbor of Charleston, which was beached by the salving tugs, and the fire extinguished largely by the pumping performed by the tugs. It was nevertheless a case of a vessel on fire, in which the crew at any time might be called upon, if not actually called upon, to perform very dangerous service in risking themselves in places more or less filled with smoke, and subject to perils of that kind, and the object of the salvage rule is to stimulate them to obey orders promptly, and to risk themselves without question, when called upon to do so. The case is somewhat analogous to that of the Colorado, referred to in the case of Conekin v. Lockwood, except that the Colorado was more completely on fire, and subject to destruction by fire, and was at sea, 20 or 30 miles from the port of Charleston, and had to be towed in, whereas the Orion was in harbor, and was not by any means so under the dominion of the fire. Nevertheless, it was a case of fire, and the crew are entitled to consideration as such, and under all the circumstances of that case the court is of the opinion that the salvage should be divided 80 per cent. to the owner of the vessel, and 20 per cent. of the salvage amount of $11,693.82 to the crew, to be divided between them in proportion to their wages.

The next case referred to in the libel is the case of the Onawa II, salvage service on which is alleged to have been performed on the 3d day of January, 1915. In that case the Onawa II, a yacht whose motive power was gasoline, either ran out of gasoline, or had something the matter with her engines, so as to be unable to proceed, and anchored not very far from the entrance to the port of Charleston. The steam tug Cecilia, upon which Alvin Rivers was a deckhand, went out to her, took her in tow, and brought her in. For this the tug received $450, which the master, R. H. Lockwood, the husband of the owner of the tug, denies was received as salvage, but insists was received as towage. It, however, was very much in advance of what he would ordinarily have charged for towage services. If it was a salvage service, it was a salvage service of a very, very low order. It is true the master of the tug claimed and received as compensation a sum so much in excess of the usual towage compensation that it smacks of salvage. But the action of the master is not determinative. He may have received much more than he was entitled to demand. The question whether it was a salvage service must be determined by the court from the circumstances. The Onawa II was at anchor, and at no risk at the time, except the risk that all boats which have motive as distinguished from sail power are at, when disabled off the shore in the open sea, and the crew of the tug was called upon to do nothing—run no risk that they would not have run in the ordinary course of an ordinary tow. At the same time the owner of a vessel is not to be encouraged, while claiming salvage, to attempt to disguise it as towage. That might operate to defeat his crew's receiving that to which they are justly entitled. Under all the circumstances of the case the court is of the

opinion, in view of the comparatively small amount paid for the service, that the service in this case was not such a salvage service as to entitle the crew to more than 10 per cent., or $45, to be divided in proportion to wages received.

The next case is the case of the barge the City of San Antonio, which was towed in by the steam tug Cecilia, in connection with the steam tug Waban. The City of San Antonio was off the coast of South Carolina, not far from the port of Charleston, and leaking badly. The weather was not severe, or dangerous, and she was taken in charge by the two tugs, towed into the harbor of Charleston, put ashore just off the city of Charleston, and there pumped out. This also was a case of salvage which partook of a towage character, but was more accentuated as salvage than the case of the Onawa II. The vessel was a barge, without any motive power, was in danger of sinking, and the crew of the tug might have been called upon to make effort; she was salved mainly by the towage power of the tugs, in connection with their pumps. The court finds that the extra sum of $20 paid in this case by the owner of the tug to the libelant as and for his salvage service in this particular case represented the full proportion to which he would be entitled for what was done.

The next case set out in the libel is the case of the yacht Neckan, which under the circumstances of the case was also largely a towage case, and the court finds that of the sum of $325 net, received for the salvage services in the case, the crew would be entitled to 10 per cent., to be paid in proportion to their wages.

The last case set out in the libel is the case of the steamship Colorado, and in this case it is found that the amount to be allowed should be the same as that which was allowed in the same case of the same vessel in the case of Conekin v. Lockwood, before referred to; that is to say, 20 per cent. of the salvage, or the sum of $3,787.86, should be allowed to the crew, of which the proportion to be paid to the deckhand Alvin Rivers (who was the deckhand who ascended the stem of the Colorado) should be in the proportion fixed by that decision, so that he would receive $4/40$, or $329.36.

In the case of William Fox and others, as part of the crew of the steam tug Waban, against the owners of that tug, the court finds in like manner that the receipts set up as containing an agreement and satisfaction in full bar to the proceedings are inoperative to have that effect, and it is so decreed.

The specific salvage cases referred to in the libel in this last cause of Fox et al. v. Igoe are the cases of the steamship Orion, the barge City of San Antonio, the steamship Colorado, and an additional steamship, the British steamship Curaca, which was salved some time in the month of June, 1916. In considering the salvage to be allowed by the court in these cases, that is to say, in the case of the Orion, it is placed at the amount as fixed in the case of Alvin Rivers, viz., at 20 per cent. of the total salvage of $11,683.82 received by the Waban, except that, in the case of the libelant William J. Fox, it appears that he was under the influence of liquor that night, the night of the salvage services, and did not get to the scene of the performance of the salvage

service until long after they had begun, and after the most critical period was over, and therefore he should be entitled to receive as his quantum only one-half of the amount that his full wage proportion would be to the whole salvage.

With regard to the case of the City of San Antonio, it is found that an extra month's pay was full compensation to the crew of the Waban for their share of the salvage service in that case.

With regard to the case of the steamship Colorado, it is found that 80 per cent. of the total salvage of $18,939.30 should go to the owners of the tug Waban, and 20 per cent., or $3,787.86, to the crew, to be divided among the crew in proportion to wages.

In the case of the steamship Curaca, in that case the steamship Curaca was stranded near the north jetty, but outside of the jetties, off Charleston harbor, and at considerable risk. Under all the circumstances, it is found that there should be paid, out of the total salvage of $8,466.71 received, 80 per cent. to the owners of the tug, and 20 per cent. to the crew, to be divided among the crew in proportion to wages.

The costs of these proceedings shall be paid by the respondents in each case.

It is further ordered that it be referred to Daniel B. Gilliland, one of the standing masters of this court, to ascertain and report the amount to which each libelant may be entitled under the principles of this decree, after charging each, respectively, with the amounts heretofore paid in each case, and that he do report the same as soon as possible, and a formal decree will then be entered in each case for the amounts adjudged due to each libelant.

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes