## THE TERESA ACCAMA.

(District Court, E. D. Virginia. December 19, 1918.)

SALVAGE ⬤═30—AMOUNT OF AWARD—RESCUE OF STEAMSHIP STRANDED AT SEA.
   A salvage award of $12,000 made for the rescue of a steamship, laden largely with explosives, stranded outside the Virginia capes, off False Cape, in the winter, vessel and cargo being valued at $2,000,000, and the service, which was efficiently performed, including towage to a safe harbor, requiring some 24 hours.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for salvage by the Merritt & Chapman Wrecking & Derrick Company against the Italian steamship Teresa Accama. Decree for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for libelant.
Edward R. Baird, Jr., of Norfolk, Va., for respondent.

WADDILL, District Judge. This is a libel to recover for salvage services rendered by the libelant to the respondent. The facts are briefly these: In the early morning of the 24th of January, 1918, off False Cape, some 2 miles northeast half east of the life-saving station, and about 20 miles south of Cape Henry, the Italian steamship Teresa Accama grounded about amidship, on the port side, for a space of about 100 feet. While there, representatives of the life-saving station came aboard, and through them, communication was had with Norfolk, calling for assistance for the stranded vessel. The libelant, being advised of the wreck, immediately dispatched its tug Rescue, properly officered, manned, and equipped, to the ship's assistance. The Rescue left Norfolk about 10 o'clock a. m., reached the scene of the stranding about 2 p. m., and after some preliminary talk between her officers, and those on the steamship, made fast to the vessel, and with considerable effort, succeeded in getting her afloat about half past 4 o'clock that evening.

The respondent insists that only about 45 minutes was taken in the effort to float the ship, while libelant says it took approximately 2 hours. Respondent further claims that the vessel was not in any serious danger, and that she was extricated from her position largely as a result of the rise of the tide, and the pumping of some 300 tons of water ballast overboard. After the ship was released, the Rescue towed her into Hampton Roads, starting about 5 a. m., reaching a place of anchorage in the vicinity and to the northward of Sewell's Point, about 10 a. m. Early the next morning, the vessel was taken to Lambert's Point, and subsequently taken to the convoy anchorage grounds for vessels containing explosives.

Respondent further insists that her purpose in communicating with Norfolk was to secure the aid of a government vessel to assist her, which would be furnished at nominal cost, and that, upon the Rescue coming, it was allowed to make fast to the Teresa Accama upon the supposition that she was a government vessel, and after the ship was gotten off the shoal it was expressly understood that she would be brought into Hampton Roads free of charge; the Rescue's master explaining that the ship could not come in without a pilot, who was not then accessible, and would not be permitted to pass through the submarine net then closing the channel at all, at that hour of the night, and that the Rescue could bring her in without delay.

The Teresa Accama, 380 feet long, 48 feet wide, 26 feet deep, gross tonnage 7,500, was a large ocean-going ship, loaded in part with a cargo of explosives, was en route from Wilmington, Del., to Genoa, Italy, and went into Hampton Roads, on account of ice conditions prevailing along the coast at that time. The value of the ship and her

cargo is alleged to be some $2,000,000. The Rescue is a large wrecking vessel, and with her outfit, worth about $250,000.

At the time of the service, the weather was good, sea smooth, and wind blowing a moderate breeze from the south. No special danger was incurred by the salvors, or the salved property, in making fast to and securing the release of the ship. The work was intelligently and expeditiously performed. The position of the ship was not one of extreme peril, but of considerable danger, having regard to the character of the coast, the size of the ship, the depth of water, and the nearness of the vessel to the shore, especially in case of a change of wind to the eastward, or of other weather conditions reasonably to be anticipated at that season of the year.

The court is not inclined to accept the respondent's statement that the services of the Rescue were availed of because it was a government ship. It was not such a ship, and, on the contrary, was one of the wrecking vessels of a well-known wrecking company, manned and operated by reputable and responsible officers, and the fact that they would have misrepresented themselves to be government officials is highly improbable. That there was some understanding that the ship would be towed in to the Roads, and that part of the service would be in the nature of towage, as distinguished from the salvage service, is strongly supported by the testimony. The court is inclined to treat that part of the service, including what was done the next day in removing the vessel from her first place of anchorage, to the safer anchorage set apart for vessels carrying explosives, as a towage and not a salvage service.

Just what would be a proper allowance for the entire service, taking into account all the circumstances of the case, is not free from difficulty, and, in fixing the same, the large values at stake and the dangerous position in which the respondent's ship was lying must be taken into account. She was en route from Wilmington, Del., to Hampton Roads, had encountered difficulty at the mouth of the Delaware river on account of large quantities of floating ice, and in proceeding to Hampton Roads had passed the Virginia Capes some 20 miles, and ran, in broad daylight, into the shoal waters off False Cape, where she went aground, and remained fast for hours, on an exposed shoal beach. Considering her value, the character of her cargo, and the vicissitudes of her journey thus far, the fact that she was promptly released, and safely gotten from the open sea into a harbor of safety and refuge, without exposure from possible weather conditions of another day and night, should not be lost sight of.

Under all the circumstances, the court believes an award of $12,000 is a reasonable one to make for the services rendered; and it will be so ordered.