**WATERMAN S. S. CORPORATION v. DEAN et al.**

**No. 5781.**

United States Court of Appeals
Fourth Circuit.

Dec. 27, 1948.

---

Eugene F. Gilligan, of New York City (Kirlin, Campbell, Hickox & Keating, of New York City, and Ober, Williams, Grimes & Stinson, and Southgate L. Morison, all of Baltimore, Md., on the brief), for appellant and cross-appellee.

I Duke Avnet, of Baltimore, Md. (Edgar Paul Boyko, of Baltimore, Md., and John P. McKinley, of Savannah, Ga., on the brief), for appellees and cross-appellants.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The sole controversy on this appeal concerns the amount to be allowed to four officers and twenty-seven men of the Furnifold M. Simmons for their successful salvage services to the S/S Fairisle, which was floated through the efforts of the Simmons after having been stranded in the Bay of Bengal off the east coast of India near a point called Bavanapadu. Neither the master nor five other members of the crew, nor the owners of the Simmons joined in the suit.

The Fairisle is a turbine driven, single screw, steel cargo steamer, length 468 feet, 6165 gross tons, 15½ knots, with a crew complement of forty-four men. Her fair salvage value was $943,875. The Simmons is a 2500 h.p. Liberty ship, owned by the United States through the War Shipping Administration, 441 feet long, 7,170 gross tons, 11 knots, and a total crew of thirty-seven. Her value was $544,506. Both vessels were without cargo or freight at the time the services in question were performed.

On August 28, 1946, while discharging cargo in Calcutta, the Simmons received a message that the Fairisle had run aground at a point 250 to 300 miles away. No standard salvage equipment was available. The Simmons, hastening to the rescue, reached Bavanapadu at 11 p.m. on August 29. She found the Fairisle lying about 50 to 75 yards from the beach, her bow facing the shore. There were rocks 10 to12 feet high at the shore line between one-half mile and a mile to the southwest, and a little way into the water at this distance were rocks projecting just above the surface. At the point where the Fairisle was stranded the bottom was hard sand of uneven depth. The water was 3 to 4 feet deep at the Fairisle's bow, but the ship lay in a "coffin" so that the water was a little deeper immediately under it than around it. The current flowed northeasterly at about 2½ knots. The sea was calm except for a long southeasterly swell and a heavy surf close to the Fairisle, and all during the operation the weather remained favorable. In this neighborhood tropical cyclonic storms occur occasionally in August and September, and become more frequent and more violent in October. Except for the possibility of such a storm the Fairisle was in no immediate danger. The rocks presented no threat as long as the weather was favorable.

On arrival, the Simmons found that the Royal Indian Navy had sent in response to

the Fairisle's plea three small craft, one comparable to a destroyer escort, and the two others less powerful than our PT boats which had tried unsuccessfully to tow the Fairisle off the sand, and finally left after their towing line parted. The Simmons undertook to tow the Fairisle off the bottom by means of a heavy, inflexible wire insurance cable, about an inch and a half in diameter, which could be brought to the Fairisle only by the prior use of smaller lines, the first of which, a small messenger line was carried to her by a life boat, since the distance was too great to shoot the line. The Simmons, fearful of being stranded herself, anchored about a quarter mile off the Fairisle. On August 31, when the first effort to secure lines between the ships was made, the small messenger line parted. On the same day, the Azaleia City, owned by the Waterman S/S Co., which also owned the Fairisle, stood by for about six hours and finally left because she was fully laden and could not come in close enough to be of any help. She did radio the Fairisle that "in your position I don't think the Simmons or myself can render you much assistance at this time" and her master ventured the opinion that there was no chance of refloating until the next spring tides which would not occur until September 18.

On September 1, the Simmons was successful, after two lifeboat trips to the Fairisle, in securing an 8 inch mooring line between the ships, but once again the lines parted. The next day the Simmons sent a motor lifeboat to take over the messenger line and start over again. The lifeboat's motor went dead close to the stern of the Fairisle, so that there was danger of her being dashed against the Fairisle by the sea; and since it was impossible to row back out, the lifeboat was beached. Another lifeboat was dispatched to bring back the men on the beach, but the surf was so rough that the men on both lifeboats, numbering about fourteen, had to spend the night on shore where it was cold, damp and uncomfortable.

After the failure of the attempt of September 2, the Fairisle sent the following message to the Simmons: "We cannot see how you can lift this ship from 3 to 4 feet at high tide. Sandbar has formed all around this vessel. We are as disappointed as you, too, are, but we cannot be pulled off by your cable." The Fairisle also radioed her owners that there was no hope of success for the Simmons' efforts. The Simmons replied: "How do you know we cannot tow you off? We haven't tried yet. Tomorrow I am maneuvering this vessel closer to you in order to get towing wire to you."

In accordance with this message, the Simmons moved in closer on September 3, and dropped her kedge anchor to keep her from swinging. On this, her fourth attempt, she was successful in securing the insurance wire by 8:30 P.M.; but in order to do this her original plan had to be modified. The surf was so heavy that it was dangerous for a lifeboat to try to get close to the stern of the Fairisle, and it was necessary to run the messenger line to the beach and connect it with a line run from the beach to the Fairisle. Even the trip from the beach to the Fairisle was not without hazard, and once the motor lifeboat making the trip filled with water and spilled the men in it.

The Simmons' chief engineer, who had spent the previous night on the beach, had observed contrary to the information in the marine charts and books for the region, that the tide at night was higher than at any other time. The Simmons, therefore, decided to make the next attempt at night. From 12:54 to 2:44 A.M. the night of September 3-4, the Fairisle was pulled out 40 feet, but slipped back into her coffin. Finally, on the night of September 4-5, after being towed from 3:24 to 5:21 A.M., and working her own engines astern, the Fairisle came clear. Thereafter she proceeded under her own power to Vizagapatam where she loaded a cargo and carried it to Baltimore without incident. Her total repair bill for damages caused by the stranding was said to be $114,000.

The entire crew of the Simmons participated at one time or another in the salvage operation, in handling the lines and manning the lifeboats, although about half of them had had no previous experience in the work of the deck department, or in the night towing. The crew received their reg-

ular wages but regular hours were, of course, impossible, and the men were called on for services whenever there was work to be done. The master of the Fairisle characterized the salvage as "difficult and hard work".

The crew of the Simmons have stressed the potential danger from storms and rocks, the long and irregular hours, the difficulty of the work, the danger to the lives of the men in the small boats, the discovery of the chief engineer which was responsible for the decision to attempt the towing at night, the discomfort to the men on the beach, and the persistence and resourcefulness of the Simmons crew in the face of what appeared even to the masters of the Fairisle and the Azaleia City to be insuperable obstacles. On the basis of these considerations they claim $300,000 as a suitable award for their services. The owners of the Fairisle, on the other hand, point to the favorable weather conditions during the operation, the likelihood that the Simmons would have had warning of any bad weather in time to put to sea and escape stranding, the comparatively short duration of the actual work, the sound condition of the Fairisle and her assistance in the project, and the failure of the Simmons to come in closer at the outset of the operations. They urge that an award of $10,900 would be quite reasonable under the circumstances. The District Judge awarded the sum of $45,100, to be distributed as follows: $1000 as a flat sum to each of the twenty-seven members of the crew, an additional $500 to each man who served in the lifeboats, and $200 for each man who had spent a night on the beach. To the officers he awarded a flat sum of $1500, an additional sum of $1000 for the officers engaged in the small boat service, and $400 to each of the officers who were stranded on the beach. The amount of his award was "influenced to a considerable extent by the present depreciated value of the dollar, and by the fact that in considering and applying as precedent the early decisions, it would be appropriate, if given precisely the same circumstances today as are disclosed in those cases, to make a considerable increase in the awards there

made." Both parties have appealed from the decree.

▇▇▇▇ We are of the opinion that the decision of the District Court should not be disturbed. The trial court is given wide discretion in fixing the amount of a salvage award, and appeals questioning only the amount awarded are not encouraged. Oelwerke Teutonia v. Erlanger & Galinger, 248 U.S. 521, 39 S.Ct. 180, 63 L.Ed. 399; Cape Fear Towing & Transportation v. Pearsall, 4 Cir., 90 F. 435; 1 Benedict on Admiralty, (6th Ed. 1940), 340-41. The amount of the award is primarily a matter of judgment to be exercised by the trial court and beyond a careful examination of the facts little remains for the appellate court except to determine whether the judgment has been exercised in accordance with the general principles respecting salvage laid down by the decisions of the courts. In The Kia Ora, 4 Cir., 252 F. 507, 508, it was said:

"The elements which enter in the estimate of salvage are: (1) The value of the property in peril and the proportion of the value lost and saved; (2) the degree of peril from which lives and property are rescued; (3) the value of the property employed by the salvor, and the risk of life and property incurred; (4) the skill and dispatch shown in rendering the service together with the foresight and skill exercised in the preparation to render it; (5) the time consumed and the labor performed by the salvor. The Blackwall, 10 Wall. 1, 19 L.Ed. 870. The consideration of all of these elements should result in an award which will express reasonable actual compensation for the labor, risk, and skill of the salvor and the use of his vessel and appliances, and an added amount based on the degree of peril of property and life and the value of the property saved and lost sufficient to promote the highest degree of readiness and efficiency for the relief of vessels in distress."

In The Blackwall, 10 Wall. 1, 14, 19 L.Ed. 870, it was said:

"Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a quantum meruit, or as

412

a remuneration pro opere et labore, but as as reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property. * * *

"Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation."

 The libelants urge that the total award should be $450,000, or about one half of the salvage value of the Fairisle, to be apportioned two-thirds to the crew, and one-third to the owners of the Simmons if they should ever make a claim. We agree with the District Judge that such an award would be absurdly excessive. Although courts have sometimes awarded 50 per cent. of the property saved in derelict cases, where the award is usually highest, there is no hard and fast rule as to the percentage to be awarded, and the modern tendency is to award less than 50 per cent. even in cases of derelict. 1 Benedict on Admiralty 340. Even the older cases are by no means so liberal as libelants are asking us here to be. An exhaustive note to The Lamington, 2 Cir., 86 F. 675, 685-696, collected 125 cases from 1797 to 1896. In only 41 of them was the award said to be 50 per cent. and over, and these cases involved derelicts, extreme difficulty or danger, or comparatively small total value saved. Moreover, several of them did not award 50 per cent. of net value saved, but only 50 per cent. of certain classes of property saved. Thirty-nine cases awarded between 25 and 50 per cent. and 45 cases awarded less than 25 per cent. In general, the higher the value of the property saved, the lower the percentage of the award, and most of the cases involving $100,000 and more awarded less than 25 per cent. Secondly, insofar as libelants' computation is based on apportioning two-thirds of the award to the crew, it is contrary to the tendency of the authorities. Although there is, of course, no fixed rule, the salvor ship generally receives a greater proportion of the total award than its crew. Robinson on Admiralty, (1939), 746-7.[1] In the instant case, the Simmons, which was not a professional salvage craft, ran a considerable risk of stranding; and there was no other vessel nearby that could have done the job. Even where the crew was exposed to considerable danger and showed unusual skill, and the salvor ship was in actual operation for only a short time and without much danger, the crew has been awarded only somewhat more than 50 per cent. The Shreveport, D.C.E.D.S.C., 42 F.2d 524.

 While precedents are not strictly controlling in salvage cases, we think that considering the amount yet to be paid to crew members who are not libelants, and to the ship, whatever its precise proportion may be determined to be, the award of $45,100 is well within the permissible limits marked out by the decided cases. It would not be profitable to spell out in detail the comparison between the case at bar and some of the authorities dealing with similar facts, but we think that reference to the cases listed in the margin, all of which dealt with refloating stranded vessels, will indicate the reasonableness of the District Judge's decision.[2]

[1] In Cape Fear Towing & Transportation v. Pearsall, 4 Cir., 90 F. 435, this court allowed an apportionment of two-thirds to owners and one-third to crew, commenting on the increasing tendency to be more liberal to the owners. In Rivers v. Lockwood, D.C.E.D.S.C., 239 F. 380, where the services lasted only a short while, the crew received only 10-20 per cent. of the total award. See also The Morzhovoi, D.C.W.D.Wash., 20 F.2d 265 (services primarily towing, no special skill required); Societa Commerciale Italiana di Nav. v. Maru Nav. Co., 4 Cir., 280 F. 334.

[2] The Kia Ora, 4 Cir., 252 F. 507 (total saved about $3,900,000, possible danger from storms, about one week's work, salvor ship $450,000, work skillfully performed, award $150,000); The Noelle, D.C.E.D.Va., 263 F. 590 ($1,625,000 saved value, salvor a wrecking tug, six hours' work, no peril to salvor, $35,000 award); The Teresa Accama, D.C.E.D. Va., 254 F. 637, ($2,000,000 saved, salvor ship $250,000, no peril, two hours' work, $12,000 award); The Bretanier, 4 Cir., 267 F. 178 ($500,000 saved value, no peril, two and a half day operation, $12,000 award).

The owners of the Fairisle contend that it was error to give weight to the depreciated value of the dollar in fixing the amount of the award. They argue that the amount of a salvage award is essentially a fraction of the value of the ship saved, and since changes in the price level affect numerator and denominator alike, the awards in the older cases truly reflect the proper percentage to award in the case at bar. This court, however, has already decided the point. It was noted in The Kia Ora, 4 Cir., 252 F. 507, 509, that whatever may have been the rule in the past, the salvage award is no longer computed on a percentage basis; and the court stressed the rise in the general price level as one of its reasons for increasing the award of the District Court. The Kia Ora, supra, 252 F. at page 511.

Affirmed.