**BURKE et al. v. UNITED STATES et al.**

United States District Court
S. D. New York.

March 30, 1951.

On Submission of Proposed Final
Decrees April 27, 1951.

William L. Standard, New York City (Louis R. Harolds, New York City, of counsel), for libelants

Irving H. Saypol, U. S. Atty., New York City (Edward R. Downing and Ruth Kearney, New York City, of counsel), for respondent United States.

WEINFELD, District Judge.

This is a libel for salvage by the master and nine members of the crew of the Pt. Cabrillo. Eighteen other members of of the crew have heretofore settled with respondent. The basic issue is the nature of the salvaging operation and the amount of the award to libelants.

The SS George R. Poole, the salvaged vessel, en route from England to Philadelphia, collided with the tanker SS Silver Peak at about 11:25 P.M. on November 13th, 1945. She sustained a gaping hole in the starboard hull above and below the waterline. Her engine room was flooded and she was rendered disabled and without power or electricity. The collision occurred in the north-south coastal shipping lane of the Atlantic Ocean about 48 miles east of the Five Fathom Light Vessel with the New Jersey coast at its nearest point about the same distance.

The Poole sent out an SOS which was received at 11:35 P.M. on November 13th by the salvor vessel, the tug Pt. Cabrillo, then about 45 miles from the Poole and proceeding from Newport News to New York. The Pt. Cabrillo was within 150 miles of its destination and under normal conditions was due to arrive there at 4:00 P.M. on November 14th. She promptly responded to the distress call and diverted her course, reaching the Poole about 2:30 A.M. on November 14th, having traveled approximately 60 miles, the Poole in the meantime having drifted northeasterly due to a southwesterly wind.

When the Pt. Cabrillo arrived at the scene it was dark and the Poole was located through searchlight assistance rendered by the Silver Peak which was still nearby. Also present was a Navy tug but she rendered no aid. Passengers on the Poole had been transferred by lifeboat to the Silver Peak for transportation to Philadelphia.

The Pt. Cabrillo was a new type vessel especially equipped and designed for deep sea towing. She was equipped with a stern guard rail and anchor which protruded so that only a limited area of her hull could be placed alongside the Poole, resulting in difficult and hazardous maneuvering.

A number of attempts were made to pass heaving lines from one vessel to the other before success was achieved. These activities lasted from 2:30 A.M. to 6:00 A.M. when the port section of a towing bridle was secured. Efforts to fasten the starboard section of the bridle were unrealized. That there was delay in getting a heaving line aboard and securing the one section of the bridle is clear but responsibility is shifted from one crew to the other. The convincing evidence, however, indicates that in the main activity was carried on by the members of the Pt. Cabrillo with little or no assistance from the crew of the salvaged vessel.

When the Pt. Cabrillo first reached the disabled vessel weather conditions were good except for mist and visibility, but grew steadily worse. The weather got so bad that one of the life rafts of the Pt. Cabrillo weighing about a ton and a half was hurled 30 feet crashing on the main deck of the Poole. Due to adverse and uncertain weather conditions it was decided to proceed with just the one leg of the bridle rather than two and the tow finally got under way at 7:37 A.M. on November 14th.

The Pt. Cabrillo was equipped with a towing machine designed to maintain a constant tension on the tow wire. The engine adjusts the working stress depending on weather and sea conditions and can be operated either automatically or manually. It could not slack wire fast enough

to overcome the sudden plunging and surging of the two vessels. The captain claims there were many submerged wrecks in the vicinity not very far beneath the keel of passing ships and so it was impossible to slack out the amount of wire ordinarily used in such towing operations, approximately 2,500 feet, due to the danger of fouling one of the submerged vessels. To avoid these hazards the Pt. Cabrillo was forced to use a short tow line which was operated manually from time to time by the captain and the chief engineer, the other members of the crew being unfamiliar with its operation. The captain went without sleep whereas the chief engineer snatched a few hours here and there.

Libelants also claim there was danger of being rammed by coastal traffic, the tow having followed the shipping lanes, and a searchlight was trained on the Poole during the nighttime to minimize danger of collision.

On the return trip rain and squall occurred, the sea becoming increasingly rough and there was much pitching and rolling. During the night of November 14th heavy gales were encountered. The velocity of the wind increased to force 8. It became necessary to change the course about 30 degrees to make up for the leeway, and at times the weather became so bad they could make no headway at all and once even lost ground.

The tow finally reached the Port of New York, a distance of 113 miles, arriving at Ambrose Lightship at 8:00 A.M. on November 15th and inside New York Harbor at noon. Thus the delay to the Pt. Cabrillo was about 20 hours and the total time consumed from the moment she altered her course to render aid to the Poole until she left her at safe anchorage was 1 day and 12 hours.

Libelants request $1,000 to each unlicensed member of the crew with a triple share to the captain and chief engineer and double shares to the two other officers, a total of $16,000. As is not unusual, respondent asserts that this demand is grossly excessive; that the nature of the services has been greatly magnified and libelants should be restricted to a total award of $1,000 in proportion to their ratings.

Salvage awards are not intended merely as compensation for work and labor performed. Public policy intends them as rewards in the nature of a bounty to encourage voluntary services by seamen and others to save imperilled lives, ships and their cargoes. The Blackwall, 10 Wall. 1, 19 L.Ed. 870; Petition of Atlantic Gulf & West Indies S. S. Lines, 2 Cir., 49 F.2d 263; Waterman S. S. Corporation v. Dean, 4 Cir., 171 F.2d 408; Joncich v. Xitco, 9 Cir., 172 F.2d 1003. Although liberality is of the essence an award should not be excessive and "The problem usually is not to award so little as to discourage salvage aid, nor so much as to encourage unnecessary or exaggerated service * *." The No. 92, 2 Cir., 252 F. 117, 119; The Niels Nielsen, 2 Cir., 277 F. 164.

The traditional elements of a salvage award are: "(1) The value of the property in peril and the proportion of the value lost and saved; (2) the degree of peril from which lives and property are rescued; (3) the value of the property employed by the salvor, and the risk of life and property incurred; (4) the skill and dispatch shown in rendering the service together with the foresight and skill exercised in the preparation to render it; (5) the time consumed and the labor performed by the salvor." The Kia Ora, 4 Cir., 252 F. 507, 508; Waterman S. S. Corporation v. Dean, supra. Thus we see that the amount of the award is a matter of judgment based upon the facts in each particular case and in accordance with the general principles referred to above.

Libelants contend that the most dangerous feature of the activities was making fast the two vessels because the Pt. Cabrillo could not be handled in close quarters, not having been designed for such an operation, that maneuvering was very difficult—if the low guard rail on the Pt. Cabrillo touched the Poole with any force it would spring her plates at the waterline and result in serious damage or possibly loss of the vessel.

Libelants further claim that the towing thereafter was also fraught with much risk and hazard due to heavy weather, submerged wrecks, danger of collision with other craft, all complicated by the fact that the Poole had a jammed rudder and would not tow like an ordinary vessel prepared for that purpose; that with only one leg of the bridle connected, a shear by the Poole and a sudden jerk by the Pt. Cabrillo would have snapped the wire and the Poole would have gone ashore.

The respondent while admitting that the services of the crew of the Pt. Cabrillo were of a salvage nature, contends that these were of a low order and were not of such high merit as to warrant other than nominal awards; that the making fast of the vessels was not efficiently performed and that the risk of danger in this operation as well as on the towing trip is greatly exaggerated.

 Whether the salvage was of a low order or high order is not of significant importance in this proceeding. The degree of salvage bears only on the value of the service and is one of the elements to be considered in determining the award. The Court finds that the salvage in this case was of a low order, but that fact does not restrict the libelants to nominal awards, as urged by the respondent. To do so would defeat the basic policy underlying the granting of salvage awards. In Texas Co. v. Texas & Gulf S. S. Co. et al., 5 Cir., 263 F. 868, 871, a question was raised as to whether services were of a high or low order of salvage. After reviewing the facts the Court held: "We therefore agree with the District Court that this is a salvage service of a low order, but that the award should be in an amount which not only will fully recompense the salvors for the time and labor expended, danger to life and property incurred in rendering such service, but will encourage others in like circumstances to render such assistance in saving life and property."

The services rendered by the Pt. Cabrillo were skillfully and efficiently performed. The Court further finds that attaching the bridle under the conditions prevailing was difficult, fraught with some danger due to the special construction of the Poole. The Poole was a dead ship and had no power or electricity since her engine room was flooded. Although she was in no danger of sinking and no immediate danger of stranding since she was capable of using her bow anchor, it is clear that she was a disabled vessel, in distress, and unable to proceed without assistance. Other vessels nearby rendered her no aid.

The collision occurred in deep water, a considerable distance from the nearest shoals. The Pt. Cabrillo and the Poole remained in shipping lanes at all times en route to New York. While the danger of encountering submerged wrecks was no greater than if they had been proceeding singly and was not as hazardous as libelants assert, nonetheless, it also presented difficulty and required under the conditions more than ordinary skill.

So, too, the precise value of the ships is not of special significance in this instance in determining the award. The value of the Poole is in sharp dispute, libelants contending that its worth is $1,500,000, whereas respondent limits it to $600,000. A definitive finding of specific value for the salvaged vessel is not essential. In this instance a finding of value between $600,000 and $1,500,000 is sufficient. While many of the earlier cases emphasize the factor of the respective values of the vessels in determining an award, recent rulings do not follow this precedent in view of the large values of present-day ships and cargoes. Waterman S. S. Corporation v. Dean, supra; The Kia Ora, supra; Breving v. The Lloyd Cuarto, D.C., 84 F. Supp. 33. The estimated cost of repairing the damage to the Poole was $190,000. As to the Pt. Cabrillo, respondent's contention that it had only scrap value is not disputed.

 Both vessels were owned by the government and were operated under General Agency Service Agreements. The fact of common ownership by the United States does not affect the award. 46 U.S.C.A. § 727; Jacobson v. Panama R.

Co., 2 Cir., 266 F. 344; Rees v. United States, D.C., 134 F. 146.

Based upon a consideration of all the evidence and the applicable law, the Court awards to each of the crew members, other than the captain and the chief engineer, $225, and as to the latter two, in view of the extra services rendered by them, the sum of $450 each, with interest from November 15th, 1946, together with costs and disbursements. In fixing the award herein the Court has considered the services and the use of the respondent's tug and also that other crew members not parties hereto were entitled to awards which they have heretofore adjusted with respondent.

The foregoing shall constitute findings of fact and conclusions of law unless the parties desire more detailed findings, in which event they may be submitted upon notice.

Submit decree in accordance with the foregoing.

On Submission of Proposed Final Decrees

Both parties have submitted proposed final decrees which differ in that libelants request interest from the date of filing of the libel, May 10th, 1946, while respondent asks that interest run only from the date when decision was rendered.

The opinion of the Court contained a typographical error with reference to the allowance of interest. The date intended by the Court was November 15th, 1945, when the salvage operation was completed, in reliance upon The West Harshaw, 2 Cir., 69 F.2d 521; Huasteca Petroleum Co. et al. v. 27,907 Bags of Coffee et al., 2 Cir., 60 F. 2d 907. However, it would appear that interest may not be allowed prior to the date of filing of the libel, and, accordingly, the decree signed herewith allows interest from May 10th, 1946. 46 U.S.C.A. § 745. No sound reason appears why libelants should be deprived of interest from the time of filing the libel. At the trial no evidence was introduced to show that the salvaged vessel was within the purview of the Public Vessels Act, 46 U.S.C.A. §§ 781–790.

Final decree signed.