C. B. DIZE et al., as Master and Crew of TUG DELAWARE, Libellants,

v.

STEEL BARGE BEVERLEY, FERRY-BOAT ACCOMAC, UNNAMED LST NO. 306, UNNAMED LCU, EXCURSION BOAT SIGHTSEER, in rem, and C. G. Willis, Inc., Tolchester Lines, Inc., et al., in personam, Respondents.

Elmer E. MILLER et al., as Master and Crew of TUG COVE POINT, Libellants,

F. L. Ebner, et al., as Master and Crew of TUG W. R. COE, Intervening Libellants,

v.

STEEL BARGE BEVERLEY, FERRY-BOAT ACCOMAC, EX U. S. NAVY VESSEL LST 306, Excursion Boat SIGHT-SEER, their equipment, etc., in rem, and C. G. Willis, Inc., et al., in personam, Respondents.

Nos. 8480, 8490.

United States District Court
E. D. Virginia,
Norfolk Division.
July 26, 1965.

Sidney H. Kelsey, Norfolk, Va., for Master and Crew of Delaware.

William C. Coupland, William L. Ward, Norfolk, Va., for Masters and Crews of Cove Point and W. R. Coe.

Harry E. McCoy, Robert M. Hughes, III, Norfolk, Va., for Beverley and C. G. Willis, Inc.

Eugene Forrest Gordman, Norfolk, Va., for Accomac, Unnamed LST No. 306, Unnamed LCU, Excursion Boat Sightseer, and their owners.

BUTZNER, District Judge.

The masters and crews of the tugs DELAWARE, COVE POINT and W. R. COE seek salvage awards for services rendered May 27, 1964 when fire broke out near Pinners Point in the Elizabeth River, Portsmouth, Virginia. Apparently the fire started in the ferryboat ACCOMAC which was lying alongside Pier 4. It spread to the pier and damaged the excursion vessel SIGHTSEER, unnamed ex-LST No. 306, unnamed ex-LCU and the steel barge BEVERLEY.

A slip is formed by Pier 4 and a spit. The barge BEVERLEY was moored in

the river across the end of the pier. The LST was moored in the slip alongside the pier near the outer end of the pier. Her bow was headed toward the river. The ACCOMAC was moored in the slip alongside the pier, astern of the LST. Her bow was headed inland. The SIGHT-SEER was moored in the slip to the starboard side of the ACCOMAC about amidships.

The mooring of the LCU was never definitely established. Apparently she was in the slip, inshore from the AC-COMAC.

At about 11:20 P.M. the master and crew of the DELAWARE learned of the fire. They arrived at Pier 4 in about ten minutes. The DELAWARE proceeded into the slip and pumped water on the ACCOMAC for forty-five minutes. Within a few minutes after the arrival of the DELAWARE, the COVE POINT reached the ACCOMAC. She pumped water on the burning vessel about twenty minutes. The W. R. COE arrived at about 11:50 P.M. She pumped water on the ACCOMAC for fifteen to twenty minutes.

Shortly after midnight the Coast Guard cutter HUDSON came into the slip and pumped water on the ACCOMAC. Men and hose from the cutter were placed aboard the burning vessel. They were, however, unable to quench the fire and after forty-five minutes were removed. About 1:15 the MADRONA, another Coast Guard cutter, came alongside and fought the ACCOMAC fire. She was joined by the MOHICAN which arrived about 2:00 o'clock. By that time the fire on the ACCOMAC was down. The MO-HICAN put a party on board with the intention of moving the ACCOMAC. Its orders were changed and its boarding party removed. A Coast Guard utility boat also fought the ACCOMAC fire from approximately midnight until 3:00 A.M.

The fire on the ACCOMAC was intense. The men on the tugs felt the heat. None of them was burned, although sparks and debris fell on the vessels. From time to time there were muffled explosions on the ACCOMAC and the crews were concerned about the explosions and the possibility of the wind blowing flames into the slip.

As Captain Elmer E. Miller, the master of the COVE POINT, fought the fire on the ACCOMAC, he proceeded from the stern to amidships. It became apparent to him that the SIGHTSEER was endangered from falling, burning debris. He secured a line on the SIGHTSEER, broke her free by backing his tug and with considerable skill backed his tug out of the slip, towing the SIGHTSEER into the channel. At one point he had about five-feet clearance from one of the other tugs and ten feet from the spit. As the SIGHTSEER passed the DELA-WARE the crew played water upon her, quenching her fire.

The COVE POINT towed the SIGHT-SEER about a mile and a half to Roanoke Dock, where the vessel was moored.

The COVE POINT immediately returned to Pier 4, arriving at approximately 12:15. By that time fire was sweeping down the pier. The lines and paint on the forward end of the BEVERLEY, particularly on the starboard side, were afire. The crew of the COVE POINT put a line aboard the BEVERLEY. With a series of jerks the master sought to free the barge. He was unsuccessful. C. L. Smith, the mate of the COVE POINT, went aboard the BEVERLEY with a fire axe to cut the stern line. He was followed by a member of the crew, who slipped and fell overboard. The crewman was in danger of being crushed between the barge and the tug or being injured by the towing line. As the master swung the tug away from the crewman, Smith pulled him aboard the barge. The heat from the pier was intense. Shielding his face, Smith cut the stern line. The bow lines apparently were burned and the tug, unassisted, was able to pull the barge free.

The DELAWARE came alongside the barge, after it was free of the pier, and quenched the fire on the forward end. The COVE POINT towed the barge to Pier P on the Norfolk side of the river.

The Norfolk Fire Department was called and the COVE POINT then returned to the fire. The DELAWARE put men aboard the BEVERLEY and after some difficulty and delay, with the assistance of the firemen, opened one of the barge's rolling hatch covers. The barge was found to be empty and without fire in her hold. The DELAWARE left the BEVERLEY shortly after 1:00 A.M.

The COVE POINT left the BEVERLEY about 12:40 A.M. when she returned to the slip off Pier 4. The master found the pier and the LST burning fiercely. The HUDSON was fighting the fire on the stern of the LST. She had five to seven men aboard with hose. The W. R. COE was also in the slip fighting the fire. The master of the COVE POINT believed that the LST could be saved from total loss only by towing her from the burning pier. He brought his tug alongside the port bow of the LST, and his crew placed a ladder against her side. Because of the heat the crew were reluctant to go aboard to secure a line. The master, himself, went up the ladder, followed by the mate. A crewman with a hose climbed on the tug to a position from which he could reach both the master and the mate with a stream of water, if necessary. In moments the master secured the tug's stern line to the bow of the LST. He and the mate returned to the tug. Simultaneously the HUDSON took off its fire crew from the stern of the LST. At 12:55 the COVE POINT pulled the LST free from the burning pier.

When the LST got out in the river the W. R. COE, the DELAWARE, the HUDSON and a Navy tug came alongside and played water upon her. A boarding crew from the Navy tug were placed on the LST with hose to fight a fire in the hold.

The DELAWARE pumped water on the LST for about thirty-five minutes. At 1:50 A.M. the DELAWARE left the scene of the fire.

The master of the COVE POINT unsuccessfully sought a berth for the burning LST. He could neither berth her nor cast her off. He towed her to Lamberts Point anchorage, about one and a half miles from the scene of the fire.

The Navy tug followed the LST to the anchorage and then departed. Shortly thereafter the HUDSON left. The W. R. COE was the last of the tugs to leave, departing at 2:35 A.M. when the fire was nearly out.

The COVE POINT held the LST at the Lamberts Point anchorage until 5:10 A.M. At 6:30 A.M. she was docked at the Seaboard pier with the assistance of the tug WATOCO. Portsmouth firemen came aboard and quenched a fire in the hold.

The master and crews of the COVE POINT and the W. R. COE make no claim against the ex LCU. The master and crew of the DELAWARE claim salvage. The master testified that they played water upon her but he does not recollect how long.

The DELAWARE and the COVE POINT are harbor tugs of approximately the same size, 96 feet in length and 23 feet in breadth. The W. R. COE is 105 feet in length and 27 feet 7 inches in breadth. All of the tugs were fitted with a fire pump, two hose connections and a fixed nozzle known as a monitor on top of the pilot house. For the most part the DELAWARE and the COVE POINT used one hose. The W. R. COE, which had a larger pumping capacity, used its monitor. The Coast Guard cutters and the Navy tug had considerably more pumping capacity than the harbor tugs.

The ACCOMAC was a ferry and excursion vessel 302 feet 6 inches in length, 50 feet 2 inches in breadth. Her gross tonnage is 1,345 tons and her net 638. She was built in 1928 and rebuilt in 1948 and 1951. Before the completion of the Chesapeake Bay Bridge Tunnel she had operated as a ferry between Little Creek and Kiptopeke, Virginia. Her present owners were proceeding to convert her into an excursion and sightseeing boat at the time of the fire. The hull and the main deck are steel. The upper deck and the deckhouse were of wooden construction on steel beams. She was propelled by two engines.

Little evidence was given concerning her value before the fire. Apparently she had not been well maintained. She was carried on the owner's books at $147,000 and insured at $150,000. The fire destroyed her entire superstructure. The port side of the vessel was heavily buckled and the plating weakened from the heat of the fire. The main deck buckled on the port side. The machinery is in fair condition. The vessel has scrap value only. Most of her value is attributed to her machinery. The value of the vessel after the fire is $20,000.

The SIGHTSEER was an old excursion boat, approximately 50 feet in length by 15 feet in breadth. She was purchased in 1944 at a cost of $16,000. She had been fully depreciated by her owner many years before but additions to her cost caused her to be carried on the owner's books at $5,000. Since the fire her owner has removed her from the Roanoke Dock and beached her. Her owner now claims she has no value and that he has abandoned her.

The BEVERLEY is a dry cargo barge built in 1960 at a cost of $93,700. She is 195 feet long, 35 feet in breadth. Her gross tonnage is 1,051 tons. She is constructed entirely of steel without wood trim. Before the fire her owners had depreciated her to approximately $55,600. In December 1964 the owners took delivery of a new barge similar to the BEVERLEY at a cost of $104,000. In August 1965 the barge will need a new bottom at a cost of approximately $35,000. Fire damage to the BEVERLEY was $1,938. Estimates of the BEVERLEY'S value after the fire range from $135,500 with cargo pending, according to the testimony of libellant's appraiser, down to $40,000 to $45,000, according to the testimony of a broker called by the respondents.

The Court is of the opinion that at the time of the fire the BEVERLEY'S value was $45,000. Her salvage value, therefore, making allowance for the repairs, is approximately $43,000.

The ex LST No. 306 was built in 1946 with an overall length of 327 feet and breadth of 50 feet. Her engines were removed before the fire. The vessel was converted for use in the Polar Regions by heavy reinforcement of the structural members of the bow section and by steel plate sheathing for ice protection. Among her remaining equipment are winches. Based on other sales, this equipment would have a value not in excess of $4,500.

Similar LST have been converted into barges with a market value of approximately $30,000 net. The evidence, however, failed to establish that this LST was suitable for conversion. The Court finds that after the fire she had scrap value only. Considering the value of the winches and the extra steel, the Court places her value at $10,000.

The ex LCU was sold after the fire for $71,000. Brokerage fees and repairs to put her in shape for sale were $26,000, leaving a net value to the owner of $45,000.

General principles of salvage are stated in The Blackwall, 77 U.S. (10 Wall.) 1, 13, 19 L.Ed. 870 (1869):

"* * *. Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service: (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

"Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a *quantum meruit,* or as a remuneration *pro opere et labore,* but as a reward given for perilous services,

voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property.

"Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation."

■ The owners of the DELAWARE and the COVE POINT and the owner and the charterer of the W. R. COE have disclaimed salvage. The Coast Guard, the Navy and civilian firemen also rendered services to the burning vessels but have made no claim for salvage. Under these circumstances the law is clear that the Court must first determine the total salvage award taking into consideration the part played by all salvors. After this has been done, that portion of the award due the claiming salvors may be allotted to them. Failure or inability of salvors to prosecute a claim inures to the benefit of the salvaged vessel and not the claiming salvors. The Blackwall, 77 U.S. (10 Wall.) 1, 15, 19 L.Ed. 870 (1869); Rauch v. Gulf Refining Co., 129 F.Supp. 843, 844 (E.D.La.1955); Norris, The Law of Salvage, § 221 (1958).

■■ The owners of the ACCOMAC and the LST assert that the salvors are entitled to no award because both vessels were so extensively burned that they are fit only for scrap, and that even if the fire had been allowed to rage unabated the vessels would still have the same scrap value. The damage done to the vessels is, of course, an appropriate factor to consider in making the salvage award. The position taken by the owners of the AC-COMAC and the LST, however, is not tenable. The salvage efforts met with some success. The fires were quenched before the vessels were completely destroyed or sunk. Cf. The Sabine, 101 U.S. 384, 25 L.Ed. 982 (1879); Norris, The Law of Salvage, § 88, et seq. (1958).

■ After the claiming salvors left the ACCOMAC, the Coast Guard and civilian firemen continued to fight the fire. This alone, however, is not sufficient to bar salvage to the claimants. The tugs DELAWARE, COVE POINT and W. R. COE fought the fire before the others arrived. The rule is clearly stated in The Annie Lord, 251 F. 157, 159 (D. Mass., 1917):

"It is not necessary, in order to establish a claim to salvage, that a salvor should actually complete the work to save the property at risk. It is sufficient if he endeavors to do so, and his efforts have a causal relation to the eventual preservation of it."

■■ The owner of the BEVERLEY points out that the barge is of steel construction without any wood trim. Even if its entire starboard side had been scorched, damages would have been only an additional $2,500. Undoubtedly her hemp mooring lines would have burned before the barge was destroyed by fire. An ebb tide would have carried the barge into the river. These facts, the owner contends, require that the award be limited to approximately 2% of the salvaged value of the barge. The Court is of the opinion that an award of this amount would be insufficient. It is futile to speculate that if the barge were adrift in the river, no harm would come to her.

The danger from fire to which the barge was subjected is a factor to be considered. The salvors, confronted with a raging fire on the pier which had spread to the barge, are not to be held to a detailed knowledge of her construction and whether she carried cargo. The measure of salvage is not determined by the theory of *quantum meruit*. Salvage has been viewed as a reward. It is given for services rendered at the risk of life. It should serve as an inducement to seamen to render this service whenever the need appears. The Blackwall, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869).

■ Salvage of the ACCOMAC, SIGHTSEER and LST required the tugs

to go into the slip where they were endangered. Under these circumstances the Court concludes that the salvage awards should be allocated 60% for the owners and 40% for the master and crew. See Waterman S. S. Corp. v. Dean, 171 F.2d 408, 412 (4th Cir. 1948).

■ Salvage of the BEVERLEY did not place the tugs within the dangerous slip. The mate of the BEVERLEY, however, was placed in considerable danger when he went aboard the burning barge to cut the lines. With respect to the BEVERLEY, the Court concludes that the salvage award should be divided equally between the owners and the master and crew.

Computation and allowance of the salvage awards are as follows:

The ACCOMAC — total salvage award: $2,000

Apportionment:

| | |
|---|---|
| Coast Guard and City firemen: | $1,200 |
| Owners and charterer of tugs: | 480 |
| Master and crew of the DELAWARE: | 160 |
| Master and crew of the COVE POINT: | 80 |
| Master and crew of the W. R. COE: | 80 |

The SIGHTSEER — total salvage award: $ 500

Apportionment:

| | |
|---|---|
| Owners of tugs: | $ 300 |
| Master and crew of the COVE POINT: | 180 |
| Master and crew of the DELAWARE: | 20 |

The BEVERLEY — total salvage award: $3,000

Apportionment:

| | |
|---|---|
| Norfolk firemen: | $ 20 |
| Owners of tugs: | 1,490 |
| Master and crew of the COVE POINT: | 1,250 |
| Master and crew of the DELAWARE: | 240 |

The ex LST — total salvage award: $2,000

Apportionment:

| | |
|---|---|
| Coast Guard, Navy tug and Fire Department: | $ 700 |
| Owners and charterer of tugs: | 780 |
| Master and crew of the COVE POINT: | 375 |
| Master and crew of the W. R. COE : | 100 |
| Master and crew of the DELAWARE: | 45 |

———◆———

The evidence does not justify any salvage award for the ex LCU.

Proctors for the libellants have advised the Court that it is unnecessary to apportion the awards individually to each master and crewman. Proctors for the libellants are requested to submit decrees.