07-3929-cv
Transportes Navieros y Terrestres S.A. v. Fairmount Heavy Transport N.V.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2008

(Argued: February 25, 2009                    Decided: June 23, 2009)

Docket No. 07-3929-cv

————————

TRANSPORTES NAVIEROS Y TERRESTRES S.A. DE C.V.,

*Plaintiff-Appellant*,

—v.—

FAIRMOUNT HEAVY TRANSPORT N.V.,

*Defendant-Appellee.*

————————

B e f o r e :

KEARSE and KATZMANN, *Circuit Judges*, and BIANCO, *District Judge.*[*]

————————

Plaintiff-Appellant appeals from an order entered July 9, 2007, in the United States

District Court for the Southern District of New York (Preska, *J.*) granting Defendant-Appellee's

motion, pursuant to Rule E(6) of the Supplemental Rules for Admiralty or Maritime Claims and

---

[*] The Honorable Joseph F. Bianco, United States District Judge for the Eastern District of
New York, sitting by designation.

Asset Forfeiture Actions, to reduce the amount held by maritime attachment. We find that the defendant demonstrated good cause to reduce the amount of the attachment and that the district court properly exercised its discretion in reducing the amount of the attachment. We therefore affirm the district court's order.

———————————

ALFRED J. RUFTY, III, Harris & Rufty, L.L.C., New Orleans, LA, *for Plaintiff -Appellant*.

CHARLES E. MURPHY (Ann C. LeVasseur, *on the brief*), Lennon, Murphy & Lennon, LLC, New York, NY, *for Defendant-Appellee*.

———————————

KATZMANN, *Circuit Judge*:

This case calls upon us to decide the circumstances in which a court pursuant to Rule E(5) or (6) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Rules") may reduce the amount held by maritime attachment.

Plaintiff-Appellant Transportes Navieros y Terrestres S.A. de C.V. ("TNT") is a foreign company organized and operating under the laws of Mexico. Defendant-Appellee Fairmount Heavy Transport N.V. ("FHT") is foreign entity organized under foreign law, with a principal place of business in The Netherlands, and cannot be found within the Southern District of New York. TNT commenced this action on April 17, 2007, by filing a Verified Complaint in the United States District Court for the Southern District of New York (Preska, *J.*), alleging that it had suffered significant monetary damages as a result of FHT's wrongful arrest of TNT's vessel, the M/V Caballo Azteca (the "Vessel"). That same day, the district court granted TNT's prayer

2

for an Order for Process of Maritime Attachment pursuant to Rule B of the Supplemental Rules, authorizing attachment of FHT's property in an amount up to $10,220,000. Thereafter, on FHT's motion, the district court reduced the amount of the maritime attachment to $15,000.

TNT appeals from the court's order entered on July 9, 2007, reducing the amount of the attachment. Because we find that the district court did not abuse its discretion in reducing the amount of the maritime attachment order, we affirm.

BACKGROUND

A.  The Vessel's Arrest and TNT's Claimed Damages

The instant dispute arises from FHT's arrest of the Vessel. At the time of the arrest, FHT was engaged in the arbitration of a maritime dispute with Oceanografia S.A. De C.V. ("OSA"). On November 10, 2005, FHT arrested the Vessel in a Rotterdam shipyard as security for its claim against OSA, believing that the Vessel belonged to OSA. TNT alleges that FHT failed to investigate reasonably the ownership of the Vessel and acted with reckless disregard of TNT's rights in the Vessel.

TNT claims that the Vessel's arrest prevented it from delivering the Vessel as it had promised. According to TNT, it entered into a charter party (the "Charter Party") with Con-Dive, LLC, on December 12, 2005, that required TNT to deliver the Vessel to Port Fourchon, Louisiana, on March 15, 2006. When TNT and Con-Dive entered into the Charter Party, both had knowledge that the Vessel was arrested in the Rotterdam shipyard. TNT alleges that it brought the Vessel to the Rotterdam shipyard at some unspecified time prior to the commencement of the Charter Party for modifications so the Vessel could meet the specifications

3

of the Charter Party; FHT claims that the Vessel had been in the Rotterdam shipyard since October 2002.

On May 15, 2006, six months after the Vessel's arrest and two months after the Vessel was allegedly due in Port Fourchon, TNT first contacted FHT to request that the arrest be lifted. FHT took immediate action to lift the arrest; the relevant authorities were notified on May 17 that the arrest had been lifted.

TNT claims that it suffered $10,220,000 in damages from FHT's wrongful arrest of the Vessel. According to TNT, its damages claim is based on: (1) liquidated damages of 10% of the Charter Party's value ($3.65 million); (2) loss of net earnings under the Charter Party (approximately $6.57 million); and (3) other damages.

B. District Court Proceedings

On April 17, 2007, TNT commenced the present action seeking an order of attachment pursuant to Rule B of the Supplemental Rules, "for the purpose of obtaining personal jurisdiction over [FHT] and to secure [TNT]'s claim." TNT alleges that a criminal proceeding against FHT is pending in Mexico and claims that it will be able to recover its claimed damages in that proceeding.

The district court issued an Order for Process of Maritime Attachment on April 17, 2007, authorizing attachment of FHT's property in an amount up to $10,220,000. Thereafter, TNT notified FHT that $1,256,354.84 of its funds had been restrained on April 25, 2007, pursuant to the order of attachment. On May 3, 2007, on FHT's motion, the district court issued an order to show cause why the maritime attachment should not be vacated or the amount of the attachment

4

reduced.

By order entered July 9, 2007, the district court denied FHT's motion to vacate and granted its motion to reduce the attachment. The court refused to vacate the attachment because it concluded that TNT's verified complaint "alleged a proper admiralty claim against FHT and fulfilled all of the other filing and service requirements of Rules B and E." Nonetheless, the court found good cause to reduce the amount of the attachment so that it "reflect[s] the amount for which FHT may be potentially held responsible to TNT, . . . [i.e., the] amount that might be attributable to legal fees required to lift the wrongful arrest." The court concluded that FHT could not be held responsible for the amount claimed by TNT in its complaint because "[TNT] failed in its duty to mitigate its damages . . . after the arrest had been effected."

TNT attempted to file a motion for reconsideration of the order reducing the attachment on July 23, 2007. That filing, however, was rejected because TNT had attempted to file both the motion and the supporting documents as one document. On July 25, 2007, a note was entered on the docket instructing TNT's attorney to re-file the motion to reconsider. TNT correctly filed the motion papers and the motion was shown on the docket sheet as filed on July 25, 2007. By order entered August 17, 2007, the district court denied the motion to reconsider. On September 12, 2007, TNT filed a notice of appeal from both the August 2007 order denying reconsideration and the July 2007 order reducing the amount of the attachment.

## MOTION TO DISMISS

FHT moves to dismiss this appeal as untimely. TNT's notice of appeal was filed within 30 days of the entry of the August 17, 2007, order denying its motion for reconsideration, but

5

more than 30 days after the entry of the July 9, 2007, order, of which reconsideration was sought. Under Federal Rule of Appellate Procedure 4(a)(4)(A), TNT's notice of appeal is timely as to the July 9, 2007, order if TNT's motion for reconsideration was timely filed. And TNT's motion for reconsideration was timely filed if it was filed on or before July 23, 2007. Fed. R. Civ. P. 59(e) (requiring a motion to alter or amend the judgment to be filed no later than 10 business days after the entry of judgment); *City of Hartford v. Chase*, 942 F.2d 130, 133 (2d Cir. 1991) (noting that, however styled, a motion that "draws into question the correctness of the district court judgment is considered to be a motion to alter or amend the judgment under Civil Rule 59(e)" (internal quotation marks omitted)).

TNT argues that its motion was filed on July 23, 2007, despite deficiencies in the motion identified by the Clerk of the Court. FHT contends that the motion was not filed until July 25, 2007, when the deficiencies were remedied and the motion complied with the applicable rules.

In *Contino v. United States*, 535 F.3d 124, 126 (2d Cir. 2008) (per curiam), we considered a notice of appeal to be timely where the appellant "attempted to file [the notice of appeal] within the required time-frame, but it was rejected by the clerk for failure to comply with a local rule." Specifically, the attempted filing was rejected because it was not in the prescribed form, having been filed electronically, rather than in hard copy. Ultimately, we deemed the notice of appeal to have been filed on the date of the attempted filing where "there [wa]s no indication that [the appellant]'s failure to submit the notice of appeal on paper was willful and, if the local rule [were] enforced, [the appellant] would lose the right to appeal." *Id.* at 127 (citing Fed. R. Civ. P. 5(d)(4) ("The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice.") and Fed. R. Civ. P. 83(a)(2) ("A

6

local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply.”)).

In this case, TNT attempted to file its motion to reconsider within the required time-frame, but it was rejected by the clerk for failing to comply with a local rule regulating the motion’s form. Because there is no indication that TNT’s failure to submit the motion for reconsideration in the proper form was willful and TNT would lose its right to appeal if the local rule regulating the form of the motion were enforced, we consider TNT’s motion for reconsideration to have been filed on July 23, 2007, the date of the attempted filing. Accordingly, TNT’s notice of appeal was timely filed within 30 days of the court’s disposition of a timely filed motion for reconsideration and FHT’s motion to dismiss the appeal as untimely is denied.

## DISCUSSION

“We review *de novo* the constructions of the statutes and rules and the conclusions of law upon which the district court based its opinion.” *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 267 (2d Cir. 2002). Where the district court has made no error of law, we review its decision to reduce a maritime attachment for abuse of discretion. *Cf. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 439 (2d Cir. 2006) (reviewing decision to vacate a maritime attachment for abuse of discretion, but reviewing any errors of law *de novo*).

A. Maritime Attachments Generally

“The power to grant attachments in admiralty is an inherent component of the admiralty

7

jurisdiction given to the federal courts under Article III of the Constitution." *Id.* at 437.  Thus,

"'[m]aritime attachment is a feature of admiralty jurisprudence that antedates both the

congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of

the first Supreme Court Admiralty Rules in 1844.'" *Winter Storm*, 310 F.3d at 267-68 (quoting

*Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir. 1996)).  The

historical purpose of maritime attachment is "first, to gain jurisdiction over an absent defendant;

and second, to assure satisfaction of a judgment." *Aqua Stoli*, 460 F.3d at 437.

The first uniform federal rules for admiralty and maritime proceedings ("Admiralty

Rules") were promulgated by the Supreme Court in 1844.  A revised version of the Admiralty

Rules was released in 1920.  In 1966, under the Rules Enabling Act, 28 U.S.C. § 2073, the

Supreme Court established the Supplemental Rules for Certain Admiralty and Maritime Claims,

383 U.S. 1071 (1966), "a reformed and comprehensive codification of admiralty rules to govern

the practice of the federal courts." *Aqua Stoli*, 460 F.3d at 438.  The Supplemental Rules have

since been amended periodically; the 1985 amendments are particularly relevant to the

availability of maritime attachments.

Rule B governs the process by which a party may obtain an ex parte order of maritime

attachment.  In relevant part, it provides:

> If a defendant is not found within the district . . . , a verified complaint
> may contain a prayer for process to attach the defendant's tangible or
> intangible personal property--up to the amount sued for--in the hands of
> garnishees named in the process.  . . . The court must review the complaint
> and affidavit and, if the conditions of this Rule B appear to exist, enter an
> order so stating and authorizing process of attachment and garnishment.

Fed. R. Civ. P. Supp. Rule B(1).

8

Once property has been restrained pursuant to an order of maritime attachment, Rule E(4)(f) provides a mechanism by which a person claiming an interest in attached property may seek to have the property released. Rule E(4)(f) states, in relevant part: "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Supp. Rule E(4)(f).

Under Rule E(5), property restrained pursuant to an order of maritime attachment may be released on the giving of security. Specifically, Rule E(5) provides:

> Whenever process of maritime attachment . . . is issued the execution of such process shall be stayed, or the property released, on the giving of security . . . . [T]he court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the *plaintiff's claim fairly stated* with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller.

Fed. R. Civ. P. Supp. Rule E(5)(a) (emphasis added); *see also infra* note 5. If security is taken by the court in lieu of attached property, Rule E(6) maintains that "the court may, on motion and hearing, for *good cause shown*, reduce the amount of security given." Fed. R. Civ. P. Supp. Rule E(6) (emphasis added).

Finally, a statutory provision also provides for the release of arrested or attached property on payment of a security. Section 2464 of Title 28 of the United States Code allows:

> [W]henever a warrant of arrest or other process in rem is issued in any admiralty case, the United States marshal shall stay the execution of such process, or discharge the property arrested if the process has been levied, on receiving from the respondent or claimant of the property a bond or stipulation in double the *amount claimed by the libellant*, with sufficient surety, to be approved by the judge of the district court where the case is pending . . . .

9

28 U.S.C. § 2464(a) (emphasis added).[1]

Although none of the foregoing provisions provide for a motion to *reduce* an attachment, the relief sought by FHT's motion is identical in substance to a motion to set a security for the release of the attached property or to reduce the security. Thus, we view the district court's decision to reduce the amount of the attachment in this case as being governed by Rule E(5), Rule E(6) and § 2464.

B. Issuing and Vacating Maritime Attachments

This Court defined the modern standard for the issuance and vacatur of maritime attachments under Rule B and Rule E(4)(f) in *Aqua Stoli*. In the years immediately prior to that decision, district courts had taken a variety of approaches to the Rule E(4)(f) hearing. "Some . . . vacated only those attachments that failed to comply with Rule B. Others . . . followed a needs test, requiring the plaintiff to show that, even if the [requirements of Rule B had been met], the attachment [wa]s necessary to obtain jurisdiction over a defendant or to secure a potential judgment." *Aqua Stoli*, 460 F.3d at 446 (footnote omitted). And the district court in *Aqua Stoli* had held that an attachment "may be vacated if the defendant shows that the plaintiff sought the attachment to obtain a tactical advantage over the defendant or that the hardship to the defendant caused by the attachment outweighs the benefit to the plaintiff." *Id.* at 439. Thus, the question presented in *Aqua Stoli* was "to what extent the district court may require a showing by the plaintiff beyond the simple fact that the textual requirements of Rule B have been met." *Id.* at

---

[1] An earlier version of this provision was first adopted in 1847 and amended in 1899. The modern statute, quoted above, is materially identical to the earlier versions of this provision. *See* Act of Mar. 3, 1847, ch. 55, 9 Stat. 181; Act of Mar. 3, 1899, ch. 441, 30 Stat. 1354.

438. Our analysis of this question began with the text of Rule E(4)(f). Because the text of the rule does not "explain under what circumstances the district court should vacate the attachment," *id.*, we considered the intent of the drafters of Rule E(4)(f), the historical purpose of maritime attachment, and the historical practice of admiralty courts. After reviewing the historical practice and purpose of maritime attachments, "[w]e h[e]ld that, once a plaintiff has carried his burden to show that his attachment satisfies the requirements of Supplemental Rule B, a district court may vacate an attachment only upon [limited] circumstances not present in this case." *Id.* at 436.

Under the Admiralty Rules of 1844 and 1920 and the version of Rule B promulgated by the Supreme Court in 1966, a plaintiff could obtain process of maritime attachment ex parte from the clerk of the district court, without the participation of a judge, *Winter Storm*, 310 F.3d at 269, and the defendant had "no clear right to contest an attachment," *Aqua Stoli*, 460 F.3d at 440.

In 1985, the Supplemental Rules were amended to address concerns that the prior practices were not consistent with the principles of due process. *Id.* at 440; Fed. R. Civ. P. Supp. Rule E, advisory committee's note (1985 amendment) (Rule E(4)(f) was "designed to satisfy the constitutional requirement of due process by guaranteeing to the shipowner a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings"). Thus, "[w]hile the practice of granting maritime attachments on an *ex parte* basis remains, Rule B(1) now requires the plaintiff to appear before a judge to procure an attachment." *Winter Storm*, 310 F.3d at 271-72. And Rule E(4)(f) was added to provide "a prompt post-seizure hearing at which the defendant could contest the validity of the seizure." *Aqua Stoli*, 460 F.3d at 440.

The Advisory Committee's notes on the amendments explain that Rule E(4)(f) "is based .

11

. . on local admiralty rules in the Eastern, Northern, and Southern Districts of New York," Fed. R. Civ. P. Supp. Rule E, advisory committee's note (1985 amendment), which had provided a hearing at which a defendant could contest an attachment, *see, e.g.*, E.D.N.Y. & S.D.N.Y. R. for Adm. & Mar. Cls. 12 (1984), *cited in Aqua Stoli*, 460 F.3d at 440. But while it is indisputable that the Rule E(4)(f) hearing was based on the hearing provided by Local Rule 12, "it is unclear whether the Supreme Court meant to adopt the vacatur standards--rather than simply the hearing--of former Local Rule 12." *Aqua Stoli*, 460 F.3d at 444; *see id.* at 440 ("The Advisory Committee's notes . . . nowhere intimate that the Court was also adopting the standards for vacatur that the Eastern and Southern Districts then practiced."). Thus, in *Aqua Stoli*, we rejected an argument that the 1985 amendment to Rule E(4)(f) was intended to adopt the standard for vacatur that the Southern and Eastern Districts of New York applied at a hearing under Local Rule 12. Nonetheless, we considered cases applying Local Rule 12 for their persuasive value. *Id.*

Our review of cases applying Local Rule 12 indicated that the local practice did not countenance a broad degree of equitable discretion in vacating maritime attachments. *Id.* at 440. Often, the "determinative question" at the Local Rule 12 hearing was "whether the textual requirements of the attachment rule were met." *Id.* at 442.

We observed that the narrow standard for vacatur applied under Local Rule 12 served "the time-honored policies embedded in Supplemental Rule B and the historical purposes of maritime attachments." *Id.* at 444. "[T]he traditional policy underlying maritime attachment has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient

to satisfy a judgment." *Id.* at 443. This policy, we explained, "has been implemented by a relatively broad maritime attachment rule, under which the attachment is quite easily obtained." *Id.* With this purpose in mind, we concluded "that Congress chose a determinate rule [regarding the availability of attachment] rather than a flexible standard to ensure that attachments may be obtained with a minimum of litigation." *Id.*

Ultimately, we held that a plaintiff can obtain an ex parte order of attachment of a defendant's assets if, "in addition to [meeting] filing and service requirements of Rules B and E," the plaintiff shows that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."[2] *Id.* at 445 (footnote omitted). Once a defendant's property has been attached, the defendant can move to vacate the attachment under Rule E(4)(f). And "a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." *Id.* We suggested, in *dicta*, that

> a district court *may* vacate the attachment if the defendant shows at the Rule E[(4)(f)] hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

---

[2] Although this Court has not yet decided what type of showing a plaintiff must make to make out a prima facie admiralty claim, several district courts have concluded that *Aqua Stoli* limits the inquiry to the face of the complaint. *See, e.g.*, *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870, at *15 (S.D.N.Y. Aug. 15, 2006). We need not address this point in this case, which calls on us to decide only whether the defendant established good cause to reduce the attachment, an inquiry that is not limited to assessing whether the plaintiff has asserted a prima facie admiralty claim.

13

*Id.* at 445 (emphasis added).

## C. Reducing the Amount of an Attachment

Since the Supplemental Rules were adopted in 1966, our circuit has not addressed how a court should determine the amount of "plaintiff's claim fairly stated" when it releases attached property under Rule E(5)(a) in exchange for the posting of a security. Neither have we addressed the circumstances in which a district court may find "good cause" to reduce a security under Rule E(6). Thus, here we are called on to give meaning to those phrases. As in *Aqua Stoli*, we must consider "to what extent the district court may require a showing by the plaintiff beyond the simple fact that the textual requirements of Rule B have been met," *Aqua Stoli*, 460 F.3d at 438, in order to sustain the full amount of an attachment in a Rule E(5) or (6) proceeding. Plaintiffs argue that the same standard should apply to motions under Rule E(5) or (6) that apply to a Rule E(4)(f) motion. But our analysis in *Aqua Stoli* was focused specifically on the provisions of Rule E(4)(f) and its historical antecedents and purpose. Our conclusions regarding Rule E(4)(f) do not apply necessarily to the provisions of Rule E(5) and (6), which have distinct historical pedigrees and implicate differently the purposes of maritime attachment. Nonetheless, a similar framework of analysis is appropriate.

Whereas Rule E(4)(f) was added to the Supplemental Rules in 1985 in response to a specific concern that the prior practice was not consistent with due process principles, the provisions of Rule E providing for the setting and reducing of a security for attached property were included in the Supplemental Rules adopted in 1966. *See* Fed. R. Civ. P. Supp. Rule E (1966). And those provisions are, in substance, a consolidation of provisions of the 1844 and

14

1920 Admiralty Rules.  *See* Fed. R. Civ. P. Supp. Rule E, advisory committee's note (1966

adoption).  As the Advisory Committee's notes on the 1966 rules explained:

> The . . . limited objective [of the Supplemental Rules] is to carry forward
> the relevant provisions of the former [Admiralty] Rules . . . , modernized
> and revised to some extent but still in the context of history and precedent.
> Accordingly, these Rules are not to be construed as limiting or impairing
> the traditional power of a district court, exercising the admiralty and
> maritime jurisdiction, to adapt its procedures and its remedies in the
> individual case, consistently with these rules, to secure the just, speedy,
> and inexpensive determination of every action.

Fed. R. Civ. P. Supp. Rule A, advisory committee's note (1966 adoption).  Specifically, the

Advisory Committee's notes explained that "[Rule E(5)] restates the substance of Admiralty

Rule 5,"[3] and that Rule E(6) was "[a]dapted from Admiralty Rule 8."[4]  Fed. R. Civ. P. Supp.

Rule E, advisory committee's note (1966 adoption).  Because Rule E(5) and (6) were intended to

adopt and continue the prior practice, the historical practice and precedent are particularly

important to our interpretation of these provisions.


### 1.  Practice and Precedent Prior to the Supplemental Rules

---

[3] Admiralty Rule 5, in relevant part, provided: "where goods . . . are attached under a
process authorizing the same, the attachment shall be dissolved by order of the court to which the
process is returnable, on the giving of a bond or stipulation . . . by the respondent whose property
is so attached . . . ."  R. of Prac. for the Cts. of the U.S. in Adm. & Mar. Jurisdiction, Rule 5, 254
U.S. 671, 680-81 (1920).

[4] Admiralty Rule 8, in relevant part, provided: "where bail is given or a bond or
stipulation is taken, the court may, on motion, for due cause shown, reduce the amount of such
bail or may reduce the amount of security given by either bond or stipulation . . . ."  R. of Prac.
for the Cts. of the U.S. in Adm. & Mar. Jurisdiction, Rule 8, 254 U.S. 671, 682 (1920).

15

Before the 1966 Supplemental Rules, a court deciding how to set a security[5] often made a preliminary assessment of the reasonableness of the plaintiff's claimed damages.

This practice is especially evident in two district court cases from New York where the district court considered the extent to which its discretion to set a security was limited by a statutory provision (the precursor to § 2464) obliging the marshal to discharge arrested property on the receiving of a bond in an amount double the claimed by the libelant. In *Peru v. The North America*, the district court concluded that it was not obliged under 9 Stat. 181[6] to set bail at twice the amount *claimed* by the libelant, noting that "[the] statute does not assume to interfere with the powers of a court of admiralty to regulate the execution of its process, and the [bail] it is authorized to take, conformable to general principles of procedure in those courts, on the particular equities of each case." 19 F. Cas. 309, 309 (S.D.N.Y. 1853) (No. 11017A). Addressing another statutory precursor to § 2464,[7] the district court reached a similar conclusion in *Haakonsen v. Lotosland Corp.* (*The Lotosland*), 2 F. Supp. 42, 43 (E.D.N.Y. 1933) (citing *The North America*, 19 F. Cas. 309). The court observed that it "would work inestimable hardship on

_____

[5]  These cases often refer to a security as bail or a "stipulation." An admiralty stipulation is "the name usually given to those securities which the parties are required to furnish or enter into, as a means of enabling the court to enforce justice. . . . The admiralty stipulation is of the nature of a recognizance." 2 Alfred Conkling, The Admiralty Jurisdiction, Law and Practice of the Courts of the United States 80 (Albany, W.C. Little & Co., 2d ed. 1857).

[6] This act was a precursor to the modern 28 U.S.C. § 2464. It provided, in relevant part, "it shall be the duty of the marshal . . . to discharge the property arrested . . . on receiving from the claimant of [the arrested property] a bond . . . in double the amount claimed by the libellant . . . to be approved by the judge of said court." Act of Mar. 3, 1847, ch. 55, 9 Stat. 181.

[7] This act provided, in relevant part, "the marshal shall . . . discharge the property arrested . . . on receiving from the claimant of the property a bond or stipulation in double the amount claimed by the libelant." Act of Mar. 3, 1899, ch. 441, 30 Stat. 1354.

16

the owner of any vessel" if the statute were interpreted to permit the release of an attached vessel only if it were secured by a bond double the amount claimed by the libelant. *Id.* Such an interpretation, the court stated, "would make necessary, for instance, in a libel involving a personal injury case, by setting forth damage in any ridiculous figure whatsoever, the filing of a stipulation or bond in double the amount, no matter how slight the actual injury or damage might have been." *Id.* The court concluded that

> [s]uch, certainly, could not have been the intention of the framers of the section; and, accordingly, it is not surprising to find, as was held in [*The North America*], that this section does not abridge the power of a court of admiralty in a suit in rem to accept bail for less than double the amount of the libelant's demand.

*Id.* It appears that Rule E(5) adopted this approach to § 2464. Citing to *The Lotosland*, the Advisory Committee's notes explain that "28 U.S.C., [sic] § 2464 is incorporated with changes of terminology, and with a substantial change as to the amount of the bond" in Rule E(5). Fed. R. Civ. P. Supp. Rule E, advisory committee's notes (1966 adoption); *see also* Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 796-97 (2d ed. 1975) (describing the interaction of § 2464 and Rule E(5)).

Having rejected the argument that the security must be set at twice the amount claimed by the libelant, the courts in *The North America* and *The Lotosland* turned to setting the security. In *The North America*, the government of Peru was claiming breach of a charter party and damages "of $50,000 and upwards," but the charter party included a liquidated damages provision setting damages at $20,000. *The North America*, 19 F. Cas. at 309 (internal quotation marks omitted). The defendants argued that Peru's recovery would be limited to $20,000 and that the bond should be set accordingly. After considering the liquidated damages provision and applicable case law,

17

the court found it ambiguous whether Peru's recovery would be limited to $20,000. Thus, the court concluded that it was appropriate to set bail according to the amount claimed by Peru, ordering the vessel to be discharged on $50,000 bail. *Id.* at 310.

When fixing the amount of the bond in *The Lotosland*, the district court considered both whether the claimed damages were available to the plaintiff as a matter of law and whether the claimed damages were reasonable based on the facts. *The Lotosland*, 2 F. Supp. at 43 (noting "the claim for care and maintenance cannot be disregarded" under the relevant case law but observing that "[t]he reasonableness of the amount of the claim is . . . another matter"). Ultimately, the court set the security at $50,000, noting that "[i]t seems to me that the libelant will be amply protected if a stipulation or bond in the amount of $50,000 is furnished." *Id.* The court did not set the bond at the amount sought by plaintiff because, "on the basis of verdicts and awards recorded in other cases, the conclusion is inescapable that the amount sought by this libelant is wholly disproportionate to those heretofore obtained." *Id.* The court reached that conclusion despite its "observ[ation] that the measure of damages resulting in [this type of claim] is always troublesome because of the numerous uncertain factors involved." *Id.*

Other cases from the mid- and late-1800s also suggest that it was the practice under the Admiralty Rules for a district court setting a security for the release of attached property to assess preliminarily whether the plaintiff's damages claim was reasonable. *See Young v. The Cherokee* (*The Monarch*), 30 F. 283, 284 (D.S.C. 1887) ("Had the stipulation been executed under an order emanating from this court, . . . I would feel no hesitation in looking into the amount demanded, and in reducing it if the facts justified me in so doing."); *The City of Hartford*, 11 F. 89, 90 (S.D.N.Y. 1882) ("The power to . . . abat[e] exorbitant security[] has long been recognized as one

18

of the incidental powers of the court in regulating its practice and proceedings."); *Forbes v. The Merrimac*, 9 F. Cas. 413, 414 (E.D.N.Y. 1866) (No. 4927) ("This court will always promptly reduce the stipulation for value required in any case, to such sum as shall seem to be reasonable security for the claim as presented in the libel . . . ."). *But see The Archer*, 1 F. Cas. 1087, 1088 (S.D.N.Y. 1878) (No. 507) ("I am referred to no statute, rule, or decision which authorizes the bonding of property . . . for less than its actual value . . . . However plain [the claimant's] apparent equity may be, it should not be determined on this motion. The . . . fact that [the libelant] seems to have much more than sufficient security[] is no reason for depriving him of any part of it.").

There are also more recent examples under the Admiralty Rules of courts assessing preliminarily the reasonableness of a plaintiff's damages claim when deciding how to set a security. The district court took such an approach in *The Fairisle*, 76 F. Supp. 27, 32 (D. Md. 1947), *affirmed sub nom.*, *Waterman S.S. Corp. v. Dean*, 171 F.2d 408 (4th Cir. 1948). In that case, "[a]fter hearing the contentions made on behalf of the respective parties, the Court concluded that libellants' figures were absurdly excessive, and ruled that a bond or stipulation in the amount of $25,000 was adequate under the circumstances as they appeared to the Court, in advance of a trial on the merits." *Id.* The $25,000 bond ordered was substantially less than the $1,000,000 that plaintiffs sought. And just a few years before the Supplemental Rules were adopted, our Court reviewed a district court's decision to release attached property worth $1,660,000 on the posting of a $250,000 bond. *Konstantinidis v. Denizcilik Bankasi T.A.O.*, 307 F.2d 584, 585 (2d Cir. 1962) (per curiam). The district court had fixed the amount of the bond based "on the apparent availability in Turkey of assets of the respondent sufficient to meet any

19

award made to the libellant in arbitration proceedings pending there and on affidavits of the proctors for both parties concerning negotiations between them for a release of the attachment." *Id.* On appeal, plaintiffs argued that these were inappropriate "considerations in determining what was a 'fair and equitable' amount for the bond." *Id.* We found no merit in the argument and affirmed the order setting the bond. *Id.*

Finally, treatises describing the practice under the Admiralty Rules confirm that district courts assessed preliminarily the reasonableness of plaintiff's damages claim when setting bail for an attached vessel. *See, e.g.*, Erastus C. Benedict, The American Admiralty 290 (4th ed. 1910) ("The stipulation of bail in a suit *in rem* is given to procure the discharge of the property proceeded against. . . . It is only necessary, therefore, that he give security to pay what the libellant may recover . . . ."); *see also* Gilmore & Black, *supra*, at 797-98 (explaining that "in case of disagreement between the parties as to the award that could be made in that case," it was "the practice under the former Admiralty Rules" that "the judge w[ould] set the stipulation at what seems to him a fair figure"). As Conkling's treatise from 1857 described:

> As the sole object of the security is the attainment of justice between the parties, the court is bound so to regulate the exercise of the right to exact it, as to prevent its abuse as well as its abridgment; and as. . . it is in the power of the libellant, by making an exorbitant demand, to compel the defendant to give excessive bail, or submit to imprisonment for want of it, it is the duty and the practice of courts of admiralty to listen to applications for the reduction of the amount of the bail. . . . This practice is accordingly sanctioned and expressly affirmed by rule *sixth* of the Rules of Admiralty Practice . . . .[8]

---

[8] Rule 6 of the 1844 Admiralty Rules is substantially similar to Rule 5 of the 1920 Admiralty Rules, which served as a basis for Supplemental Rule E(5). It provided: "In all suits in personam, where bail is taken, the court may, upon motion for due cause shown, reduce the amount of the sum contained in the bond or stipulation therefor . . . ." R. of Prac. of the Cts. of the U.S. in Causes of Adm. & Mar. Jurisdiction, 44 U.S. (3 How.) at i, iv (1845).

2 Conkling, *supra*, at 112-13.

2.  Rule E(5) and (6) and the Purpose of Maritime Attachment

As in *Aqua Stoli*, the historical purposes of maritime attachment are an important consideration in defining the standard that applies to a Rule E(5) or (6) motion.  In *Aqua Stoli*, we found those purposes to be served by a rule that allowed courts only limited discretion to vacate an attachment where a valid prima facie admiralty claim had been stated and the requirements for an attachment had been fulfilled.  We are not persuaded that similarly curtailing the district court's discretion to set or reduce a security serves those purposes.  Moreover, limiting a district court's discretion to set or reduce a security in the same way that we have limited its discretion under Rule E(4)(f) creates a substantial and unnecessary risk that plaintiffs will abuse the maritime attachment power.

Allowing district courts to assess preliminarily whether the damages claim is reasonable when setting a security under Rule E(5) or weigh this and other equitable considerations when reducing a security under Rule E(6) would not frustrate the purpose of maritime attachments in the same way that such inquiries in a Rule E(4)(f) proceeding would frustrate the purpose of maritime attachments.  Maritime attachments serve two purposes:  "first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." *Aqua Stoli*, 460 F.3d at 437.  The first of these purposes would be undermined were a court to have broad discretion over whether to grant or vacate an attachment.  But there is an important distinction between vacating an attachment and reducing the security for attached property such that a court's discretion in the former is troubling, but not in the latter.  In maritime attachment cases, the court has jurisdiction

21

because the defendant's *res* is within its jurisdiction. *Winter Storm*, 310 F.3d at 268 ("The jurisdiction conferred by a maritime attachment is characterized as *quasi in rem*."). Thus, when a court either refuses to issue or vacates an attachment, the court deprives itself of jurisdiction. Such a problem does not exist where the court merely reduces the value of the *res* within its jurisdiction. The second purpose of maritime attachments is served by a rule that allows courts to set the security at an amount that fairly reflects the plaintiffs' likely recovery. This purpose does not require that property in excess of the amount necessary to ensure satisfaction of the judgment be attached.[9]

Absent district court discretion to set a security based on a preliminary assessment of a plaintiff's claims or to reduce the security based on a weighing of the equities, there would be no mechanism to ensure that maritime plaintiffs do not abuse the attachment procedure by claiming damages that have no basis in reality. Although we might tolerate such a risk to "ensure that attachments may be obtained with a minimum of litigation," *Aqua Stoli*, 460 F.3d at 443, there is no need to tolerate the risk of abuse to ensure that a security in excess of the plaintiff's likely

---

[9] We recognize that a problem might arise if the security is set at or reduced to an amount that is less than the value of the attached property if the security is insufficient to cover the eventual award. In such a case, it could be argued that the court does not have jurisdiction to award any amount in excess of the attachment. While there is some support for that position, *see, e.g.*, *Logue Stevedoring Corp. v. The Dalzellance*, 198 F.2d 369, 372 (2d Cir. 1952) ("The ordinary practice in admiralty does not permit a personal judgment to be entered upon a mere libel *in rem*."), other cases suggest that a personal judgment in addition to the in rem judgment could be entered in such circumstances, *see Savas v. Maria Trading Corp.*, 285 F.2d 336, 340-41 (4th Cir. 1960); *Mosher v. Tate* (*The Fearless*), 182 F.2d 475, 479-80 (9th Cir. 1950); *The Minnetonka*, 146 F. 509, 514-15 (2d Cir. 1906); *The Fairisle*, 76 F. Supp. at 32-34; *see also* Gilmore & Black, *supra*, at 802-03; Recent Case, Answer on Merits to In Rem Libel Is Basis for In Personam Judgment, 64 Harv. L. Rev. 164, 165 (1950). District courts, therefore, should be careful not to set or reduce unfairly the security required, especially where the likely recovery is difficult to assess preliminarily.

recovery may be maintained. As the district court observed in *The Lotosland*, it would "work inestimable hardship" on the defendant if a plaintiff could obtain an attachment for any amount it claimed in damages, no matter how exaggerated. 2 F. Supp. at 43.

Finally, we are not persuaded by TNT's argument that if the scope of the permissible inquiry under Rule E(5) or (6) is broader than the inquiry under Rule E(4)(f), "district courts could in virtually every case circumvent *Aqua Stoli* by . . . reducing [the security] to a mere nominal sum." Appellant's Br. at 22. This argument is premised on a presumption that district courts would not apply the law faithfully, setting or reducing a security in a way that is not warranted by the circumstances. We assume that district court judges apply the law faithfully and we will not interpret the Supplemental Rules based on a contrary assumption.

### 3. Cases Applying Rule E(5) and (6)

Prior to our decision in *Aqua Stoli*,[10] district courts and circuit courts consistently

---

[10] Since our decision in *Aqua Stoli*, numerous district court opinions have considered whether an attachment could be reduced under Rule E(6). Without guidance from us on the applicability of *Aqua Stoli* to a Rule E(5) or (6) proceeding, these decisions do not reflect a consensus regarding what these provisions require. For example, some decisions suggest that the court is limited to evaluating the prima facie claim while others ask whether "sufficient evidence" supports plaintiff's claim, or, as in the decision below, whether undisputed evidence contradicts plaintiff's claim. *See, e.g.*, *Totalmar Navigation Corp. v. ATN Indus., Inc.*, No. 08 Civ. 1659, 2008 WL 5111316, at *5-*6 (S.D.N.Y. Dec. 3, 2008) (finding good cause to reduce the attachment); *Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp.*, 571 F. Supp. 2d 531, 537-38 (S.D.N.Y. 2008) (finding no good cause under Rule E(6) to reduce the attachment where plaintiff's damages calculation is not frivolous); *Sixteen Thirteen Marine S.A. v. Congentra A.G.*, No. 08 Civ. 1318, 2008 WL 2885307, at *9 (S.D.N.Y. July 25, 2008) (reducing attachment under Rule E(6) where a portion of plaintiff's damages was based on "little more than wishful thinking" unsupported by any factual allegations); *Sanko S.S. Co. v. China Nat'l Chartering Corp.*, 536 F. Supp. 2d 362, 368 (S.D.N.Y. 2008) (concluding "that the amount of the attachment must be reduced as [plaintiff] has overreached in the amount it attached based on this claim" and, absent "documentary evidence regarding fees and costs," "accept[ing] [defendant's] estimation of

23

concluded that a district court had discretion to make a preliminary assessment of the reasonableness of plaintiff's claimed damages when setting a security and to weigh this and other equitable considerations when reducing a security. *See, e.g.*, *Shakit v. M/V Forum Trader*, 14 F.3d 5, 8 (5th Cir. 1993) (concluding that the district court's "order setting the release bond at $150,000 [despite plaintiffs' $6 million claim] is . . . an exercise of the district court's discretion to value the plaintiffs' claims"); *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 238-39 (S.D.N.Y. 1996) (reducing attachment pursuant to Rule E(6) where plaintiff's claim was oversecured by virtue of a partially duplicative attachment in Korea); *Angad v. M/V Fareast Trader*, No. G-89-221, 1989 WL 201605, at *3 (S.D. Tex. Aug. 23, 1989) (finding the bond properly fixed where affidavits showed the amount of the plaintiff's claim fairly stated exceeded the value of the vessel); *Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy*, 542 F. Supp. 1302, 1304-05 (W.D. Wash. 1982) (assessing value of plaintiff's claim and concluding that security is not clearly excessive so no reduction in the security is warranted); *Techem Chem. Co. v. M/T Choyo Maru*, 416 F. Supp. 960, 970-72 (D. Md. 1976) (observing that the record justifies

---

. . . sufficient security for costs"); *Rice Co. v. Express Sea Transp. Corp.*, No. 07 Civ. 7077, 2007 WL 4142774, at *3 (S.D.N.Y. Nov. 15, 2007) (finding no good cause to reduce the attachment despite a factual dispute where evidence suggested that plaintiff's damages estimate was non-frivolous); *Ronda Ship Mgmt. Inc. v. Doha Asian Games Org., Comm.*, 511 F. Supp. 2d 399, 406 (S.D.N.Y. 2007) (finding good cause to reduce the attachment where plaintiff seeks security for damages arising from a charter party that is not mentioned in the complaint); *Flame Mar. Ltd. v. Hassan Ali Rice Exp. Co.*, No. 07 Civ. 4426, 2007 WL 2489680, at *2 (S.D.N.Y. Aug. 31, 2007) (reducing attachment "to reflect the maximum award that [plaintiff] can recover in [the arbitration proceedings]"); *Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Sen.*, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006) (finding "good cause" pursuant to Rule E(6) to reduce the amount of a maritime attachment where the complaint did not accurately allege the amount of damages as evidenced by the parties' underlying contract); *Daeshin Shipping Co. v. Meridian Bulk Carriers, Ltd.*, No. 05 Civ. 7173, 2005 WL 2446236, at *2 (S.D.N.Y. Oct. 3, 2005) (reducing attachment to amount of damages for which plaintiff offered substantiating evidence).

24

equitable relief – requiring plaintiffs to post a counter-security – where the amount claimed in the complaint was unjustified and the vessel's arrest had imposed substantial expense on defendant).

In *20th Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1429 (M.D. Fla. 1997), relying largely on the text of the rule and a citation to Moore's Federal Practice and Procedure, the district court observed:

> While guiding standards are sparse . . . when parties cannot agree on a bond amount, affidavits as to the amount of plaintiff's claim "fairly stated" have been considered in setting bonds under Supplemental Rule E(5)(a). The Court may look beyond the "four corners" of the claim in setting the bond.
>
> . . . .
>
> > [[T]he 'fairly stated' provision of Rule E(5)] indicates that the court is not bound by any monetary amount set forth in the complaint, but can look behind the complaint to ascertain the amount actually in controversy. . . . Where the claim is unliquidated and the parties cannot agree as to the amount of the bond, it will be incumbent upon the court to make some effort to place a reasonable value on the claim.

*Id.* at 1430-31 (citations and internal quotation marks omitted).

In order to determine whether to reduce the amount of an attachment in *Rolls Royce Industrial Power (India) v. M.V. Fratzis M.*, No. 95 Civ. 2630, 1995 WL 846690, at *9-11 (S.D.N.Y. July 24, 1995), the district court considered each of plaintiffs' damages claims and evaluated the reasonableness of the claimed damages. As to one category of damages, the court could not determine, on the available record, whether defendants' factual assertions were accurate. The court concluded, therefore, that "the proper course is to refrain from disturbing the present attachment." *Id.* at *11. But the court went on to note specifically "that at any time when the facts become more clear, the defendants may apply for a reduction under Rule E(6). That is what Rule E(6) is for." *Id.* As to the plaintiffs' claim for punitive damages, the court concluded

25

that

there is no reasonable basis, in fact or in law, to factor that amount into the attachment. I do not undertake this afternoon to say, as a matter of law, that the plaintiffs will not, at the end of the case, be able to recover punitive damages. But I am asked to take that particular element into account and give it a value of $500,000 for the purpose of continuing a restraint upon the defendants' economic situation. So, I must give some preliminary consideration to whether punitive damages are recoverable in a case such as this.

And it seems to me that the authority in this circuit is so clearly against the plaintiffs that it would not be right to include that element, even at this preliminary stage.

*Id.* at *12.

\*       \*       \*

In light of the historical practice and purpose of maritime attachments, we conclude that a court may assess preliminarily the reasonableness of plaintiff's damages claim when setting a security under Rule E(5) and may weigh this and other equitable considerations when evaluating whether good cause exists to reduce a security under Rule E(6). In making a preliminary assessment of plaintiff's damages claim, the court should be satisfied that the plaintiff's claims are not frivolous, but it should not require the plaintiff to prove its damages with exactitude. *See, e.g.*, *Dongbu Express Co.*, 944 F. Supp. at 237; *Rolls Royce*, 1995 WL 846692, at *8, *12; *The Fairisle*, 76 F. Supp. at 32; *The Lotosland*, 2 F. Supp. at 43.

D. FHT's Motion to Reduce the Attachment

Having concluded that a district court may assess the reasonableness of plaintiff's

26

claimed damages and weigh other equitable considerations when it sets or reduces a security, we turn to whether the reduction in this case was an abuse of discretion. We conclude that it was not.

After considering the allegations of the complaint and undisputed evidence of the circumstances of the Vessel's attachment and release, the court concluded that TNT's damages claim was unreasonable. The facts before the district court demonstrated that TNT waited more than six months to seek the release of the Vessel from an attachment it believed was wrongful and that FHT released the Vessel immediately upon being notified that the arrest was wrongful. In these circumstances, we agree that TNT likely cannot show that the wrongful arrest of the Vessel actually caused its claimed damages, which according to TNT's allegations were suffered after TNT was aware of the wrongful arrest but before it took any action to secure the Vessel's release. Therefore, the district court did not abuse its discretion in drawing the preliminary conclusion that TNT was likely to recover only the costs it incurred in securing the release of the Vessel.

## CONCLUSION

For the foregoing reasons, we AFFIRM the order entered July 9, 2007, reducing the amount of the attachment.