ING Bank N.V. v. M/V Maritime King

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2017

No. 16-3944-cv

CHEMOIL ADANI PVT. LTD.,
*Intervenor-Plaintiff-Appellant,*

I.N.G. BANK, N.V.,
*Plaintiff-Appellant,*

*v.*

M/V MARITIME KING,
*Defendant-Appellee.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 1:16-cv-03456— Katherine B. Forrest, *Judge.*

————

Argued: March 15, 2018
Decided: July 9, 2018

————

Before: PARKER, WESLEY, and LIVINGSTON, *Circuit Judges.*

————

————

J. Stephen Simms, Simms Showers LLP, Baltimore, MD, *for Chemoil Adani Pvt. Ltd.*

Bruce G. Paulsen, Brian P. Maloney, Seward & Kissel LLP, New York, NY; and James D. Bercaw & Robert J. Stefani, King Krebs & Jurgens, PLLC, New Orleans, LA, *for ING Bank, N.V.*

James H. Power, Marie E. Larsen, Holland & Knight LLP, New York, NY, *for M/V MARITIME KING.*

————

Per Curiam:

## BACKGROUND

ING Bank, N.V. ("ING") and Chemoil Adani Pvt. Ltd. ("Chemoil") appeal from a judgment of the United States District Court for the Southern District of New York (Katherine B. Forrest, *J.*). The District Court granted summary judgment to defendant *in rem* M/V MARITIME KING (the "Vessel") on a competing maritime lien claim brought against it by ING and Chemoil under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, arising from the provision of bunkers (marine

fuel) to the Vessel. *See ING Bank, N.V. v. M/V TEMARA*, No. 16-cv-95, 2016 WL 6156320 (S.D.N.Y. Oct. 21, 2016).[1] The District Court also reduced the principal amount and interest rate posted by CldN Cobelfret S.A. ("Cobelfret"), the charterer of the Vessel, to secure the Vessel's release from arrest. *See ING Bank N.V. v. M/V VOGE FIESTA*, No. 16-cv-2051, 2016 WL 8136300 (S.D.N.Y. Oct. 20, 2016).

In October 2014, Cobelfret contracted with O.W. Bunker (Switzerland) S.A. ("O.W. Switzerland") to supply bunkers to the Vessel. To do so, O.W. Switzerland utilized the services of an intermediary, O.W. Middle East DMCC, which, in turn, selected a local supplier, Chemoil, to physically supply the bunkers. Chemoil supplied the bunkers to the Vessel in November 2014.

Cobelfret did not pay for the bunkers and ING, as the purported assignee of O.W. Switzerland,[2] filed a complaint *in rem*

[1] The issues raised on appeal in response to the order denying ING's maritime lien claim and granting summary judgment, *sua sponte*, to the Vessel are addressed in a companion summary order.

[2] In December 2013, eleven months before O.W. Bunker & Trading A/S ("O.W. Bunker Group") declared bankruptcy, ING and O.W. Bunker Group entered into a $700 million revolving credit agreement, funded by a syndicate of lenders, which provided working capital for O.W. Bunker Group. ING contends that the Credit Agreement was secured by, among other things, an assignment of O.W. Bunker Group's receivables from the bunker transactions it had conducted—including the right to payment for the bunkers delivered to the Vessel.

3

against the Vessel in the United States District Court for the District of Maryland, seeking a maritime lien for the amounts owed. Chemoil intervened in that proceeding and asserted a competing maritime lien for the same bunkers and the Vessel was arrested. To secure the release of the Vessel, Cobelfret agreed to post security. The court fixed the security at $235,804.29, the full amount requested by ING, and in addition required Cobelfret to post 6% per annum as interest in accordance with Federal Rules of Civil Procedure Supplemental Rules for Admiralty and Maritime Claims ("Fed. R. Civ. P. Admiralty Supp."), Rule E(5).

The case was eventually transferred to the Southern District of New York, where ING moved for summary judgment on its maritime lien claim. The District Court denied ING's motion and instead *sua sponte* granted summary judgment to the Vessel. The District Court also entered an order reducing the security to $147,202.47 and reducing the interest rate from 6% to 3.5% per annum. ING argues on this appeal that the District Court erred in reducing the security. We disagree.

# DISCUSSION

"We review *de novo* the constructions of the statutes and rules and the conclusions of law upon which the district court based its decision." *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmont Heavy Transp., N.V.*, 572 F.3d 96, 100 (2d Cir. 2009). "Where the district court has made no error of law, we review its decision to reduce a maritime attachment for abuse of discretion." *Id.*

The purposes of a maritime attachment are twofold: "first, to gain jurisdiction over an absent defendant, and second, to assure satisfaction of a judgment." *Aqua Stoli Shipping Ltd. v. Gardner Smirth Pty Ltd.*, 460 F.3d 434, 437 (2d Cir. 2006) (overruled on other grounds in *Shipping Corp. of India v. Jaldhi Overseas Pte. Ltd.*, 585 F.3d 58 (2d Cir. 2009)). When a vessel is restrained pursuant to an order of a maritime attachment, "any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Admiralty Supp. R. E(4)(f). Under Rule E(5), the vessel may be released on the giving of security. When the parties cannot agree to the amount of

security, a court "shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs." Fed. R. Civ. P. Admiralty Supp R. E(5)(a). This Rule goes on to provide that:

> [T]he principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller. The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum.

*Id*. Where, as here, security is posted and a vessel is released, Rule E(6) empowers the court to reduce security. Rule E(6) provides that the court "may, on motion and hearing, for good cause shown, reduce the amount of security given."

After security is set, the circumstances or the conditions that initially supported security at a particular level can change. Rule E(6) is intended to accommodate such changes. On one hand, the amount set by a court typically places a cap on a plaintiff's recovery. On the other hand, a court must be mindful that excessive security is inherently unfair and restrains funds that a vessel's owner is entitled to use for other purposes. *See Transportes*, 572 F.3d at 108-09 ("Absent district court discretion to . . . reduce the security based on a

weighing of the equities . . . it would work inestimable hardship on the defendant if a plaintiff could obtain an attachment for any amount it claimed in damages."). Rule E(6) is intended to afford courts the flexibility to balance these competing interests. As the District Court noted, "[i]n exercising discretion to reduce security under Rule E(6), courts strive to strike this balance carefully and equitably." *M/V VOGE FIESTA*, 2016 WL 8136300, at \*2.

Given these considerations, we have broadly instructed that when a court is requested to reduce security under Rule E(6), it should assess the reasonableness of plaintiff's damages claim and "weigh other equitable considerations." *Transportes*, 572 F.3d at 111. The reason for this flexibility is that "limiting a district court's discretion to set or reduce a security in the same way that we have limited its discretion under Rule E(4)(f) creates a substantial and unnecessary risk that plaintiffs will abuse the maritime attachment power." *Id*. at 108.

Here, the District Court found that Cobelfret had shown "good cause" for reducing security. The District Court assessed the reasonableness of ING's damages claim and noted that "rather than reduce security by a proxy or rule of thumb, the Court shall require

7

an accounting of the statutorily permitted components of security to ensure that ING may recover its due under a favorable judgment (if any), while also preventing inequitable over-securitization." *M/V VOGE FIESTA*, 2016 WL 8136300, at \*2. The District Court also explained its choice of assigning 3.5% (the prime rate at the time that it issued its opinion on October 20, 2016, taking into account recent inflation rates) as opposed to the 6% rate mentioned in Rule E(5). *See id.*, at \*1 n.1 ("Accrued interest is intended to ensure fair compensation, not windfall profit.").

The District Court did not violate either Rule E(5) or E(6) when it lowered the interest rate. As mentioned, Rule E(5)(a) requires that the "bond or stipulation" be conditioned upon the payment of the principal sum, plus "interest thereon at 6 per cent per annum." ING argues that the 6% interest rate required by E(5)(a) cannot be changed pursuant to Rule E(6). We do not agree. Rule E(5) governs the initial setting of security. Rule E(6), on the other hand, broadly accommodates changed circumstances by affording district courts the discretion to lower or raise security for "good cause shown." We see no reason to constrict this latitude by rewriting Rule

E(6) to exempt the appropriate interest rate from the "good cause" calculus.

We therefore conclude that the District Court committed no legal error in imposing an interest rate other than the 6% rate mentioned in Rule E(5). Nor did the District Court abuse its discretion in determining that there was "good cause shown" for reducing the interest rate to 3.5%.

**CONCLUSION**

For these reasons, we AFFIRM the District Court's judgment reducing security.